629 F.2d 1
 202 U.S.App.D.C. 369, 5 Media L. Rep. 2649
 CBS, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Carter/Mondale Presidential Committee, Inc., National
Association of Broadcasters, et al., Intervenors.
AMERICAN BROADCASTING COMPANIES, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
National Association of Broadcasters, Carter/Mondale
Presidential Committee, Inc., Intervenors.
NATIONAL BROADCASTING COMPANY, INC., Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
Carter/Mondale Presidential Committee, Inc., National
Association of Broadcasters, et al., Intervenors.
 Nos. 79-2403, 79-2406 and 79-2407.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 10, 1980.
Decided March 14, 1980.
Rehearing Denied May 15, 1980.
Certiorari Granted Nov. 3, 1980.
See 101 S.Ct. 353.
 
 Petitions for Review of Orders of the Federal Communications commission.
 Timothy B. Dyk, Washington, D.C., with whom J. Roger Wollenberg, Thomas W. White and Joseph DeFranco, Washington, D.C., were on brief, for petitioner in No. 79-2403.
 Thomas N. Frohock, Washington, D.C., with whom James A. McKenna, Jr. and Carl R. Ramey, Washington, D.C., were on brief, for petitioner in No. 79-2406.
 Floyd Abrams, New York City, with whom Dean I. Ringel, George H. Freeman, New York City, and Howard Monderer, Washington, D.C., were on the brief, for petitioner in No. 79-2407.
 Robert R. Bruce, Gen. Counsel, F.C.C., Washington, D.C., with whom David J. Saylor, Deputy Gen. Counsel, Terry Michael Banks, Associate Gen. Counsel, C. Grey Pash, Jr., and Lisa Margolis, Counsel, F.C.C., and John J. Powers, III, Atty., Dept. of Justice, Washington, D.C., were on brief, for respondents.
 
 
 1
 John D. Lane, Washington, D.C., with whom Ramsey L. Woodworth, Howard K. McCombs and Anthony F. Essaye, Washington, D.C., were on brief, for intervenor, Carter/Mondale Presidential Committee.
 
 
 2
 Erwin G. Krasnow, Washington, D.C., was on brief, for intervenor, National Association of Broadcasters.
 
 
 3
 Heidi P. Sanchez, was on brief for Amici Curiae, National Citizens Committee for Broadcasting, et al., urging affirmance.
 
 
 4
 Bruce E. Fein, Atty., Dept. of Justice, Washington, D.C., also entered an appearance for respondent, United States of America.
 
 
 5
 Jerry W. Markham, Washington, D.C., also entered an appearance for intervenor, Carter/Mondale Presidential Committee.
 
 
 6
 Before BAZELON, Senior Circuit Judge, TAMM, Circuit Judge, and MARKEY,* Judge, United States Court of Customs and Patent Appeals.
 
 
 7
 Opinion for the Court filed by Senior Circuit Judge BAZELON.
 
 
 8
 Concurring opinion filed by Circuit Judge TAMM.
 
 BAZELON, Senior Circuit Judge:
 
 9
 In these consolidated appeals, the three major television networks seek review of orders by the Federal Communications Commission (FCC) finding that they had failed to fulfill their obligation under Section 312(a)(7) of the Communications Act[1] to permit "purchase of reasonable amounts of time for the use of a broadcasting station by a legally qualified candidate for Federal elective office on behalf of his candidacy."[2]
 
 
 10
 In October, 1979, the Carter-Mondale Presidential Committee (CMPC) asked that the three networks make available to it a half-hour of television time in early December, 1979. The networks declined to do so. CMPC filed a complaint with the FCC charging a violation of Section 312(a)(7). The Commission concluded that the response of each of the networks to the Committee's request to purchase time was unreasonable because the networks had failed to apply the proper legal standard in denying the request.[3] It ordered the networks to comply with the requirements of the Act. The networks appealed. We affirm.
 
 I. THE SITUATION
 
 11
 On October 11, 1979, Gerald M. Rafshoon, President of the Carter-Mondale Presidential Committee, wrote each of the three major television networks, asking that they make available a 30-minute program slot between 8:00 PM and 10:30 PM on either December 4, 5, 6, or 7.[4] CMPC intended to present a documentary outlining President Jimmy Carter's record and that of his administration. The program was to be presented just after the President's formal announcement of his candidacy, and it was designed to set the tone for the President's campaign.
 
 
 12
 The networks declined to make the requested time available saying in essence that it was too much time, too soon in the race. CBS offered to make two 5-minute segments available; one in prime time (10:55 PM) on December 8, and one in the daytime class.[5] ABC told CMPC that it had not yet reached a decision as to when it would commence the sale of political time for the 1980 Presidential campaign, but that it would do so shortly.[6] It subsequently indicated that it would begin such coverage in January, 1980.[7] NBC simply indicated that it was not prepared to sell time for political programs in December, a month "too early in the political season for nationwide broadcast time to be made available for paid political purposes."[8]
 
 
 13
 On October 29, 1979, CMPC filed with the FCC a complaint charging that the networks had violated their obligation to provide "reasonable access" pursuant to Section 312(a)(7). At an open meeting on November 20, 1979, the Commission found by a four-to-three vote that the networks had violated Section 312(a)(7). It issued a detailed Memorandum Opinion and Order (Order I) the next day[9] directing the networks to indicate by November 26, 1979, how they intended to fulfill their obligation under the Act.[10]
 
 
 14
 The networks all sought reconsideration of the Commission's decision. Their reconsideration petitions were denied, however, and on November 28, 1979, the Commission issued a second Memorandum Opinion and Order (Order II)[11] clarifying its decision of the previous week. Order II set November 29, 1979 as the deadline by which the networks were required to file their plans for compliance with the statute.
 
 
 15
 On November 28, 1979, the networks petitioned this court for review of the FCC orders.[12] They also requested the court to stay the FCC orders pending such review, a request which we granted.
 
 
 16
 For reasons external to the campaign (primarily the perceived need to focus national attention on the plight of the American hostages in Iran), the Carter-Mondale Committee determined to postpone to early January the program it had planned to broadcast during the period December 4 to 7. It was still felt, however, that some time was needed in conjunction with the President's announcement of his candidacy. Accordingly, CMPC sought and subsequently obtained from CBS the purchase of five minutes of time on December 4. It also sought and obtained from ABC and NBC offers of time for a 30-minute program in early January, and the ABC offer was accepted. Throughout these negotiations CMPC, as well as the networks, reserved all rights relating to this appeal.
 
 
 17
 II. THE EXISTENCE OF AN AFFIRMATIVE RIGHT OF ACCESS FOR
 
 CANDIDATES SEEKING FEDERAL ELECTIVE OFFICE
 
 18
 In the early days of this nation, political campaigns even presidential campaigns were relatively simple affairs. Campaigning took the form of speeches "from stump and pulpit, of debate in the highly partisan press, of private correspondence, and of persuasive activities on election day."[13] Near the close of the nineteenth century, however, as printing presses became more common and the price of paper decreased, the "era of campaign literature" began.[14] Radio was first used in the 1924 campaign: Calvin Coolidge spent $120,000 for radio time; his opponent, John W. Davis, spent $40,000.[15] By 1928, it was the most important campaign medium.[16] Television was a factor in the 1948 election: Republican rivals Harold E. Stassen and Thomas E. Dewey conducted a television debate before the Oregon primary. By the 1952 campaign, presidential candidates were spending millions of dollars on television.[17] Today, there can be no doubt that we are in the "era of television campaigning."[18] Indeed, since 95 percent of our people operate a television set for an average of over five hours a day,[19] and 60 percent of them rely primarily on television for news,[20] it would be hard to overestimate the importance of television to our political processes. It is undisputed that "(f)or presidential and senatorial candidates, the television is a necessity."[21]
 
 
 19
 Against this backdrop, Congress passed the Federal Election Campaign Act of 1971, including as one of its four Titles the Campaign Communications Reform Act (Title I). Title I contained three significant provisions: (1) the FCC was empowered to revoke a station's license "for willful or repeated failure to allow reasonable access to or permit purchase of reasonable amounts of time for the use of a broadcasting station by a legally qualified candidate for federal elective office on behalf of his candidacy;"[22] (2) during a specified period before a primary or general election, a broadcast station was not permitted to charge a legally qualified candidate for any public office a fee in excess of its "lowest unit charge . . . for the same class and amount of time for the same period;"[23] and, (3) in using the communications media, candidates for federal elective office were not permitted to exceed established spending limits.[24] The first of these provisions was codified as Section 312(a)(7) and is the basis of this litigation.
 
 
 20
 The networks argue that Section 312(a)(7) did not create a new right of access for federal candidates. They contend that the statute merely codified FCC policies developed prior to 1971 under the public interest standard. They cite as support for this proposition dictum from the Supreme Court decision in Columbia Broadcasting System, Inc. v. Democratic National Committee :
 
 
 21
 In 1959, as noted earlier, Congress amended § 315(a) of the Act to give statutory approval to the Commission's Fairness Doctrine. Very recently, Congress amended § 312(a) of the 1934 Act to authorize the Commission to revoke a station license "for willful or repeated failure to allow reasonable access to or to permit purchase of reasonable amounts of time for the use of a broadcasting station by a legally qualified candidate for Federal elective office on behalf of his candidacy." This amendment essentially codified the Commission's prior interpretation of § 315(a) as requiring broadcasters to make time available to political candidates.[25]
 
 
 22
 On the other hand, the Commission and amici argue that the plain meaning of the statutory language and the statute's legislative history indicate that Congress did create in Section 312(a)(7) a new right of access for federal candidates.
 
 
 23
 The question is whether Section 312(a)(7) creates a right in candidates for federal elective office to advocate their candidacies by direct broadcast communication to the electorate. Such a right is properly called an affirmative right of access. It exists regardless of the actions of the broadcaster. By contrast, a contingent right of access must be activated by some prior event.[26] Access achieved under the equal time provision of Section 315,[27] for example, is a contingent right of access. Our study of the plain language of Section 312(a)(7) and our review of the legislative history of the provision leads us to conclude that Section 312(a)(7) did not merely codify prior FCC policy and that it did create a new right of affirmative access for candidates to federal elective office.
 
 A. The Plain Language of Section 312(a)(7)
 
 24
 The plain language of Section 312(a)(7) authorizes the FCC to revoke a broadcaster's license
 
 
 25
 for willful or repeated failure to allow reasonable access to or to permit purchase of reasonable amounts of time for the use of a broadcasting station by a legally qualified candidate for Federal elective office on behalf of his candidacy.[28]
 
 
 26
 The provision speaks in terms of individual candidates "a legally qualified candidate" seeking time to advocate "his candidacy." By contrast, the Commission's policy before Section 312(a)(7) gave no attention to individual candidates. The Commission summarized its practice prior to the adoption of Section 312(a)(7) in its Report and Order, Commission Policy in Enforcing Section 312(a)(7) :
 
 
 27
 Prior to the enactment of (Section 312(a)(7)), we recognized political broadcasting as one of the fourteen basic elements necessary to meet the public interest, needs and desires of the community. No legally qualified candidate had, at that time, a specific right of access to a broadcasting station. However, stations were required to make reasonable, good faith judgments about the importance and interest of particular races. Based upon those judgments, licensees were to determine how much time should be made available for candidates in each race on either a paid or an unpaid basis. There was no requirement that such time be made available for specific "uses" of a broadcasting station to which Section 315 "equal opportunities" would be applicable.[29]
 
 
 28
 The change of focus manifested in the language of Section 312(a)(7), especially when seen against this backdrop of previous Commission policy, indicates that Congress was doing something different in that provision and supports the view that the legislators were creating a new right for individual candidates when they passed that provision.[30]
 
 
 29
 Additionally, it is noteworthy that Section 312(a)(7) establishes an access right for candidates for federal office. The public interest doctrine, to the extent it establishes a right of access at all, does so for all offices federal, state, and local. If Section 312(a)(7) does no more than codify the requirements of the public interest doctrine, it is peculiar that its plain language limits it to federal elections.[31] This is a clear indication that candidates in federal elections were being singled out for something beyond the amorphous right of access created by the public interest doctrine.
 
 
 30
 B. The Legislative History of Section 312(a)(7)
 
 
 31
 The legislative history of Section 312(a)(7) and of the statute in which it was passed provides support for the view that Section 312(a)(7) created an affirmative right of access for federal candidates. Section 312(a)(7) was enacted as part of Title I of the Federal Election Campaign Act of 1971. One of the primary purposes of Title I was "to give candidates for public office greater access to the media so that they may better explain their stand on the issues, and thereby more fully and completely inform the voters."[32]
 
 
 32
 The supporters of the provision in the Senate saw it as a means of creating a new right of access. Senator Pastore, opening the hearings before the Senate Subcommittee on Communication concerning the Act, noted that increased access could be accomplished either by repeal of Section 315 or by mandating a scheme of access.[33] Senators Scott and Mathias, the co-sponsors of Section 312(a) (7), proposed the section as a means of granting access especially to the nonincumbent candidate who needs it most.[34]
 
 
 33
 An amendment to the second sentence of Section 315(a) which was adopted at the same time as Section 312(a)(7) lends further support to our reading of Congressional intent. Prior to 1971, the second sentence of Section 315 made clear that broadcasters were not common carriers as to an initial request by a political candidate but only as to responsive requests under the equal opportunities provision of the Section. When the Congress adopted Section 312(a)(7) in 1971, it amended the second sentence of Section 315(a) to read: "No obligation is imposed under this subsection upon any licensee to allow the use of its station by any such candidate." The conference reports state that the addition of the language "under this subsection" was a "conforming amendment" necessitated by the adoption of Section 312(a)(7).[35] If Section 312(a)(7) was merely intended to codify pre-existing obligations and add the sanction of revocation, no "conforming amendment" to Section 315 would have been required.
 
 
 34
 While not dispositive, subsequent events also lend credence to our reading of the statute. In 1973, the Senate reviewed the results of the 1972 campaign in light of the Federal Election Reform Act of 1971. The Committee also had under consideration new bills proposing the repeal of Section 315. Then FCC Chairman Dean Burch testified concerning, among other things, the Commission's experience with Section 312(a)(7).[36] He informed the Committee that the Commission had issued a statement setting forth its understanding that "Section 312(a)(7) now imposes on the overall obligation to operate in the public interest the additional specific requirement that reasonable access and purchase of reasonable amounts of time be afforded candidates for Federal office."[37] After explaining how the Commission was interpreting the statute, Chairman Burch stated: "(i)f we have erred in some important construction, we would, of course, welcome Congressional guidance."[38] Senator Pastore, the floor manager for the 1971 Act, responded that the Commission was going about the task well.[39] Two days later in these hearings, Dr. Frank Stanton, Vice Chairman of CBS, made a strong plea to the Committee for the repeal of Section 312(a)(7). Dr. Stanton stated:
 
 
 35
 Section 312(a) now requires that on the pain of license revocation a broadcaster must make available to candidates for a federal elective office reasonable amounts of paid time or reasonable access to free time.[40]
 
 Dr. Stanton went even further by stating:
 
 36
 Section 312 grants rights to all legally qualified candidates for Federal office and as the phrase "legally qualified" has been interpreted by the FCC it includes many a fringe candidate.[41]
 
 
 37
 Our study of the legislative history of Section 312(a)(7) causes us to agree that it requires a broadcaster to "make available to candidates for a federal elective office reasonable amounts of paid time."[42] To put it another way, our reading of the legislative history leads us to conclude that Section 312(a)(7) creates the right of affirmative access that the networks are contesting in these cases.
 
 C. The Relevance of CBS v. DNC
 
 38
 The strongest support for the networks' contention that Section 312(a)(7) did not create a new right of access is dictum in the Supreme Court's opinion in Columbia Broadcasting System, Inc. v. Democratic National Committee.[43] In light of the plain language and statutory history of Section 312(a)(7), we find that CBS v. DNC is not controlling here. In CBS v. DNC, the Court was considering a decision by the FCC that neither the Communications Act nor the First Amendment required the agency to force broadcasters to accept paid editorial advertisements from citizens at large. The Court held that the agency was not required to establish such an affirmative right of access for all citizens. While treating this issue in a lengthy opinion, the Court, in a passage that was deferential to both Congress and the FCC, noted that the Commission had frequently ruled that no private individual had a right of access, and that Congress had not reversed that policy.[44] Then it noted that Congress had not adopted a general right of access in spite of the fact that it had amended the Communications Act several times. It was in a footnote to this point that the Court alluded to Section 312(a)(7) as one of several amendments to the Act which had been adopted. The Court said in cursory fashion that Section 312(a)(7) "essentially" codified the prior standards of the Commission.[45] This dictum strayed far from what was before the Court, and it was uttered in a case quite different from those before us.
 
 
 39
 The Supreme Court in CBS v. DNC held that the First Amendment does not require that citizens at large be granted access to broadcasting facilities upon request. The "essentially codified" language indicates at most the Court's judgment that Section 312(a)(7) represents no departure from one principle embodied in the public interest standard to wit, that one limited class of speakers, political candidates, has a stronger claim to the airwaves than do citizens at large. The Court's dictum is not a denial that Congress had enacted, in 1971, a very specific, obligatory right of access for federal candidates. In disallowing a potentially expansive system of access, the Court simply had no need to pass on whether Congress had adopted the much more limited affirmative right of access embodied in Section 312(a)(7).
 
 
 40
 It is noteworthy that, in the case before us, the deference to Congress and the Commission which the Court manifested in CBS v. DNC[46] cuts in favor of the existence of a limited right of access. Here, the Commission uses a statutory provision to support, rather than resist, the imposition of a limited affirmative right of access.
 
 D. Summary of Section II
 
 41
 At oral argument, counsel for ABC was asked whether he would accept the proposition that Section 312(a)(7) created some right of access on the part of federal candidates at some point in the campaign. He said that he would. On further questioning from the bench, he admitted that therefore the issue of candidate access before us could be reduced to two questions: (1) when does the right of access attach, and (2) how might we decide whether the treatment accorded a given request for access is reasonable.
 
 
 42
 We agree. Our study of the language and history of Section 312(a)(7) leads us to conclude that it did create an affirmative right of access for individual candidates for federal elective office. It is the implementation of that right of access by the FCC which must now be examined.
 
 
 43
 III. THE IMPLEMENTATION BY THE FCC OF THE AFFIRMATIVE RIGHT
 
 
 44
 OF ACCESS FOR CANDIDATES SEEKING FEDERAL ELECTIVE OFFICE
 
 
 45
 The networks challenge the implementation of Section 312(a)(7) by the Commission, arguing that the orders involved here are arbitrary, capricious, and contrary both to the statute and to prior FCC interpretations of the statute. They contend that in these cases the Commission improperly substituted its judgment for that of the broadcasters in deciding what access was reasonable.
 
 
 46
 The Commission responds that the orders are based upon reasonable standards, previously articulated. It contends that in these cases it assumed only a narrow overseer's role that it focused primarily on whether the broadcasters had given full consideration to all the relevant factors. It repudiates any attempt to substitute its judgment for that of the broadcasters. Rather, it claims that it confined itself to judging the objective reasonableness of the broadcasters' actions based upon their own explanations of the bases of their decisions.
 
 
 47
 The Commission's authority to interpret Section 312(a)(7) is not in dispute. That authority derives from Section 303(r) of the Communications Act which provides that the Commission shall "make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of the Act . . ."[47] It is the propriety of the Commission's implementation of the statute in these specific cases that is challenged by the networks.
 
 
 48
 In the eight years since Section 312(a)(7) became law, the Commission has developed its interpretation of the statute, usually on a case by case basis. Only occasionally has it issued general interpretive statements.[48] The 1978 Report and Order, Commission Policy in Enforcing Section 312(a)(7) of the Communications Act[49] is by far its most thorough statement to date. While this generally ad hoc approach is not ideal, we cannot say that during the process the Commission has been "indifferent to the rule of law,"[50] as the petitioners contend. Varying applications of Section 312(a)(7) have occurred, but only where varying factual contexts have required it. New developments in the agency's interpretation of the statute have surfaced, but never without good cause, adequately explained. We are satisfied that the Commission's orders in this case are within the agency's statutory authority and do not represent an abuse of discretion.
 
 A. Determining When the Campaign Has Begun
 
 49
 The networks claim a right to refuse to sell time to candidates "too early" in the campaign. In the instant case, they contend that the Carter-Mondale Presidential Committee was requesting too much time, too soon in the race. They argue that the national political conventions and the general election were too far away to justify the airtime sought by CMPC.
 
 
 50
 The Commission counters that the question of when the obligations imposed by Section 312(a)(7) attach is a threshold question which has "an inherently . . . objective character."[51] It argues that neither broadcasters nor candidates "bring a perspective of total objectivity as to questions of the initial applicability of Section 312(a)(7)."[52] It concludes, therefore, that it is the FCC's statutory obligation "to make a determination on this threshold issue . . . based on (an) independent evaluation of the status of the campaign, taking into account the position of the candidate and the networks as well as other factors."[53]
 
 
 51
 In this case, the agency looked to a variety of "objective indicia" in determining that the campaign had begun. Among the factors considered were: announcements of candidacy, the establishment of national campaign organizations, fund raising activities, endorsements, media coverage, and the progress of the delegate selection process.[54] "In this context," the Commission stated, "the only reasonable conclusion to be drawn is that the campaign is in full swing now."[55]
 
 
 52
 It is noteworthy that the networks do not challenge the reasonableness of the indicia used by the FCC in reaching its conclusion. Nor do they challenge the reasonableness of the conclusion itself. They argue only that the agency ought not address the question at all.
 
 
 53
 The networks argue that the FCC's decision to treat "the question of when" as one to be answered by the Commission "cannot be reconciled with" its prior statements on the issue.[56] It is true that, prior to the orders now under review, the Commission's pronouncements on this point have lacked the clarity that facilitates review. Still, we are unable to conclude that the present orders "cannot be reconciled with" these earlier renditions of the Commission's position. The 1978 Report and Order, the only statement by the Commission which addressed the issue in a meaningful way, seems to have assumed that the "question of when" was addressed to the FCC. Therein, the Commission declined to place any uniform limits on the period during which Section 312(a)(7) applied "because each campaign is unique with respect to the controversiality and importance of the issues involved, the public interest in the race, and the amount of campaigning done by the candidates."[57] Determining to proceed on a case-by-case basis, the Commission specifically foresaw the possibility that "a presidential campaign may be in full swing almost a year before an election. . . ."[58] The key fact is that the Commission declined to define uniform limits. It did not foreswear the power to do so; indeed, it affirmed the power to decide on a case by case basis when campaigns had begun.[59]
 
 
 54
 ABC argues that if the FCC undertakes the task of deciding when a campaign has begun in order to enforce Section 312(a)(7), the agency will be impermissibly involved in the election process. This would be true only if the Commission sought to set a starting date for the campaign, rather than merely find that it has already begun. As described in the orders under review, the Commission's determination of when the statutory obligations attach does not control the electoral process. To the contrary, the determination is controlled by the process.[60] There is nothing offensive about such a system.[61]
 
 
 55
 Finally, all three networks argue that permitting the FCC to decide the "question of when" would violate their First Amendment rights. Though we reserve discussion of most of the constitutional arguments raised by the networks for a later section of this opinion,[62] we treat this one here. Simply put, not all aspects of the broadcasting business enjoy constitutional protection.[63] It is the editorial process that is protected and, as the Supreme Court has explained, "editing is selection and choice of material."[64] A determination of when statutory obligations attach is not an editorial decision. More specifically, deciding whether a campaign has begun for the purposes of Section 312(a)(7) involves no choice of material; it is purely a legal judgment. And, "a legal judgment by a licensee . . . cannot be legally binding upon the FCC or this court . . . ."[65] Therefore, there is no constitutional objection to a determination by the Commission defining the point during a campaign when the obligations of Section 312(a)(7) attach.
 
 
 56
 The networks ignore the fact that by raising "the question of when" the Commission has narrowed the scope of the statute and has limited its impact on broadcasters. On its face, the statute applies to "a legally qualified candidate for Federal elective office." It might be read as vesting rights in the individual candidate at such time as he becomes legally qualified without regard to the stage of the campaign. By confining the applicability of Section 312(a)(7) to a period when the campaign is fully under way, the Commission has limited the statute's impact on broadcasters.[66]
 
 
 57
 In summary, the Commission was justified in pronouncing its right to decide when in the campaign the access rights granted to candidates by Section 312(a)(7) attach. This determination is an objective, noneditorial judgment for which the Commission is better suited than either broadcasters or candidates. The Commission was also justified in opting for a campaign-by-campaign approach to the question rather than for a uniform rule. The indicia adduced by the FCC for this campaign-by-campaign analysis are reasonable, and they were reasonably applied in this case. The Commission's actions in this regard comported with prior FCC rulings and are constitutionally acceptable.
 
 
 58
 B. Determining Whether Reasonable Access Has Been Granted
 
 
 59
 Once the threshold determination that a campaign has begun is made by the Commission, it remains for someone to decide whether reasonable access has been granted to specific requesting candidates. The networks argue that the Commission has created a system of inconsistent standards which vitiates broadcaster discretion by overvaluing the candidate's desires. The Commission responds that it has articulated reasonable standards which value both "broadcaster discretion and broadcaster accountability,"[67] and it contends that these standards have been consistent over time.
 
 
 60
 Before we discuss the merits of these claims, we must consider one significant prefatory issue. From the language of Section 312(a)(7), it is not obvious whether, once the campaign has begun, the reasonableness of the access provided a candidate is to be measured from the perspective of the requestor or from that of the grantor (the broadcaster). The CMPC argues the case as if the standard were whether a reasonable request has been made.[68] It is clear that the networks perceive their obligation insofar as they perceive that they have one at all as an obligation to make a reasonable offer. To the extent it faces this problem directly, the Commission requires that the offer of access be reasonable with due consideration of the particular needs of the candidate.[69] This position is consistent with the Commission's 1978 Report and Order.[70] As between the two possible readings of the statute, this latter view better reflects the legislative history.
 
 
 61
 We now turn to our discussion of the standards employed to determine whether reasonable access has been granted in specific cases.
 
 
 62
 (1) The Type of Review Conducted by the Commission in Examining a Broadcaster's Decision. All parties to this litigation pay lip-service to the concept of broadcaster discretion. The issue is: to what extent is deference paid to the editorial rights of the broadcasters by the Commission's definition of "reasonable access?" The broadcasters say their discretion is effectively eliminated. The FCC says it preserves broadcaster discretion while seeking only broadcaster accountability. We find that the agency has succeeded in its delicate task by confining itself to a review of two questions: (1) has the broadcaster adverted to the proper standards in deciding whether to grant a request for access, and (2) is the broadcaster's explanation for his decision reasonable in terms of those standards? Discretion remains with the broadcaster, but not discretion to act without reasonable regard to the standards.
 
 
 63
 The Commission describes the type of review it has employed for access cases as forcing the networks to take a "hard look"[71] and it cites Greater Boston Television Corp. v. FCC[72] and Citizens to Preserve Overton Park, Inc. v. Volpe.[73] Often the "hard look" metaphor is used to mask a content-less test, however. Here, we take the Commission to be saying that it will insist that broadcasters consider and address all non-frivolous matters in responding to a candidate's request for time. We approve this approach.
 
 
 64
 We hasten, however, to note the restraints upon the reviewing tribunal that are inherent in this type of review. As Justice Harlan observed in applying the concept to reviewing courts :
 
 
 65
 The court's responsibility is not to supplant (a) Commission's balance of . . . these interests with one more nearly to its liking, but instead to assure itself that the Commission has given reasoned consideration to each of the pertinent factors. Judicial review of the Commission's orders will therefore function accurately and efficaciously only if the Commission indicates fully and carefully the methods by which, and the purpose for which, it has chosen to act . . . .[74]
 
 
 66
 The Commission was correct in concluding that it should confine its role to "judging the objective reasonableness of the licensee's determination"[75] and that it must avoid making its own subjective judgments or substituting its judgment for that of the broadcaster.
 
 
 67
 The Commission has required that broadcasters file, "in response to a complaint, a full explanation of a broadcaster's decision." A statement of reasons is indispensable to meaningful review. If the Commission is to limit its role in determining whether the broadcaster has considered and addressed all non-frivolous matters in processing an access request, such a requirement is not only proper but also necessary.
 
 
 68
 (2) The Standards to Which a Broadcaster Should Advert in Deciding Whether to Grant a Specific Request for Access. The networks claim that the standards applied by the Commission in these cases are vague, inconsistent with previous FCC statements concerning the relevant standards, and unduly considerate of the candidate's desires. The Commission contends that the standards it has proffered have been articulated clearly and consistently in recent years, and it avers that they strike the proper balance between the statutory goal of access for candidates and the needs of broadcast journalists. After reviewing the standards advanced by the FCC in these cases and in its earlier statements on this subject (especially the 1978 Report and Order ),[76] we conclude that the commission has articulated reasonable standards to guide broadcasters in determining whether to grant specific requests for access. In addition, though the Commission's thinking clearly has been evolving, we find no fundamental inconsistency between its earlier statements and its action in these cases.
 
 
 69
 In its 1978 Report and Order, the FCC declined to adopt formalized rules to implement Section 312(a)(7) because "there are no (such) rules which would encompass all the various circumstances possible during an election campaign."[77] However, it did note and discuss "areas . . . where some guidelines would be appropriate to clear up confusion expressed by candidates and licensees and to ensure that the Congressional intent in enacting Section 312(a) is fully realized."[78]
 
 
 70
 According to the FCC, some appropriate considerations are: (a) the individual needs of the candidate (as expressed by the candidate); (b) the amount of time previously provided to the candidate; (c) potential disruption of regular programming; (d) the number of other candidates likely to invoke equal opportunity rights if the broadcaster grants the request before him; and, (e) the timing of the request.
 
 
 71
 In its 1978 statement, the Commission stressed that the individual needs of the candidate making the request for access deserved special weight. It indicated a belief
 
 
 72
 that Federal candidates are the intended beneficiary of Section 312(a)(7) and therefore a candidate's desires as to the method of conducting his or her media campaign should be considered by licensees in granting reasonable access.[79]
 
 It went further:
 
 73
 A Federal candidate's decisions as to the best method of pursuing his or her media campaign should be honored as much as possible under the 'reasonable' limits imposed by the licensee.[80]
 
 
 74
 The Commission noted that it would be particularly unreasonable for a broadcaster to
 
 
 75
 follow a policy of flatly banning access by a Federal candidate to any of the classes and lengths of program or spot time in the same periods which the station offers to commercial advertisers. We feel certain that Congress in granting Federal candidates a specific right of access to a station wished such candidates to be at least on par with commercial advertisers who have no such access rights. . . .[81]
 
 
 76
 Indeed, it flatly proscribed such across-the-board bans.[82]
 
 
 77
 In its first order in the cases at hand, the Commission noted that it placed "particular emphasis" on the candidate's needs. But it pointed out that
 
 
 78
 (i)n taking this factor into account, the licensee . . . does retain some discretion to evaluate the reasonableness of (the candidate's) assessment (of his needs) in the broad sense and to weigh that factor against other factors which we have said are relevant.[83]
 
 
 79
 In its second order, the agency explained even more fully "how the specific nature or purpose of a particular candidate's request should be weighed."[84] The Commission indicated that the broadcaster was not to evaluate the candidate's needs insofar as they involve the candidate's subjective, personal or immediate political desires. Nor should the broadcaster second guess the political wisdom of the candidate's request.[85] Instead, in evaluating the candidate's needs, the broadcaster was to act in a manner that was responsive to the candidate's request.
 
 
 80
 In this overall weighing process, we nevertheless believe that a broadcaster should be required to demonstrate the extent to which he has attempted to tailor his offer of airtime to be as reasonably responsive as possible (given countervailing factors) to a particular candidate's stated purpose in seeking the airtime. For example, a candidate might request an opportunity to discuss a complex set of issues important to the electorate which he believes cannot be accomplished through spot announcements or short program requests. In our view Section 312(a)(7)'s goal of encouraging electorate-informing discussion requires a broadcaster to take into account this aspect of the individual candidate's request.[86]
 
 
 81
 Thus, consideration of the candidate's needs should manifest itself in "a specific rather than blanket response to individual requests (which affords) greater assurance . . . that (the) candidate's interests cannot be ignored in the balancing process."[87]
 
 
 82
 The individual need of the candidate is only the first consideration advanced by the Commission to guide broadcasters in determining whether to grant a specific request for access. A second consideration is the amount of time previously provided to the candidate. Clearly, as the amount of time already provided to a candidate increases, the strength of his request for additional time decreases. This consideration merely reflects the fact that inherent in the term "reasonable access" is the notion that the broadcaster may place some limits on the amount of time it will make available to any single candidate. It follows that whatever the broadcaster's obligation to provide access to a candidate, the obligation will be greater if the candidate has not previously been provided time.
 
 
 83
 In this respect, the networks have misinterpreted the Commission's statements regarding the weight to be accorded a candidate's first request. The networks argue that the FCC gives so much weight to the first request of a candidate that a first request cannot be denied. At oral argument, counsel for FCC protested that nothing in the Commission's decisions requires that first requests be granted automatically. He contended that the Commission merely noted that, as the first request, it could not be denied on the basis that the candidate had already obtained a reasonable amount of time to satisfy the statute.[88] We read the orders under review to say exactly that. The decisions allow the broadcaster leeway to demonstrate that the amount of time requested cannot be granted because of the likelihood of subsequent requests or that a candidate's stated purpose could be accomplished with a lesser amount of time even if there is no probability that other candidates will request time.[89] Thus in the cases at hand a counter-offer of 15 minutes as opposed to a half-hour may have been defensible.
 
 
 84
 The third consideration advanced by the FCC to guide broadcasters in granting or denying access requests is the potential disruption of the broadcaster's regular programming. The simple fact that a broadcaster would have to make some changes in his program schedule is not a sufficient basis for denying a request unless those changes would amount to a "substantial" disruptive impact. Congress envisioned a system where federal candidates would have access presumably by displacing some regular programming. Only substantial disruption of a broadcaster's regular programming is entitled to weight in the balancing process.
 
 
 85
 The danger of disruption is greatest, of course, in the closing days of a campaign when most, if not all, candidates will desire air time. The farther away one moves from election day, the more diluted the impact of mandatory political "uses." Thus, the Commission has indicated that the danger of disruption will be weighted more heavily later in the campaign.[90]
 
 
 86
 Section 312(a)(7) operates against the background of the equal time requirements of Section 315.[91] The fourth consideration that broadcasters may weigh in addressing a candidate's request for time is the number of other candidates likely to invoke equal opportunity rights if the broadcaster grants the request before him. At a given point, the potential disruption might justify denying or, more likely, limiting a request for time. More often, a likelihood of a large number of equal time requests might justify modification of requirements concomitant to the access right. For example, in its 1978 Report and Order, the FCC said:
 
 
 87
 We are aware that there may be situations where the number of Federal candidates in a particular election may make it impossible for a station to make prime-time program-time available. We have never held that the "prime-time, program-time" policy is absolute and inflexible. We will continue to make exceptions to this policy where circumstances dictate.[92]
 
 
 88
 The fifth consideration offered by the FCC to guide broadcasters faced with requests for access is the timing of the request itself. This is separate from the question of when obligations under Section 312(a)(7) attach. Here the issue is whether the candidate has given the broadcaster reasonable notice that he desires to purchase time notice sufficient to permit the broadcaster to make the adjustments in its schedule that may be required. If a request is made months in advance, denying it is more unreasonable than it would be if it is made only days before the proposed broadcast.
 
 
 89
 Finally, the Commission has articulated an overarching consideration to which broadcasters must attend in considering a candidate's request for time. The broadcaster must articulate with clarity the basis for his decision. He must address the five considerations just outlined when they are relevant, and he must treat any others that might bear on the individual case.[93]
 
 
 90
 C. Applying the Standards to the Cases at Hand
 
 
 91
 We must now consider whether the record in these cases adequately supports the Commission's conclusion that the networks failed to apply the proper standards. We hold that it does.
 
 
 92
 NBC and ABC refused to sell the Carter-Mondale Presidential Committee any time in December, saying it was too early in the campaign. The networks have not contested the reasonableness of the Commission's finding that the campaign was in full swing. Instead, they argued that as a legal matter the Commission did not have the power to make that finding. However, we have affirmed the FCC's authority to make that decision.[94] It follows that the Commission was correct in finding that NBC and ABC had failed to apply the proper standards in responding to CMPC's request for time.[95]
 
 
 93
 The networks in this regard, all three networks displayed unreasonable disregard for the relevant standards in a second way, however. NBC and ABC, by deciding that it was too early to sell time to any candidate, had settled on what amounted to an across-the-board ban on candidate access. CBS, for its part, had in September adopted a policy of selling two five-minute spots to candidates who requested time in 1979.[96] While the CBS policy did not represent a total ban, it was also an across-the-board policy. Such across-the-board policies violated the longstanding mandate of the Commission that, in addressing a request for access from a candidate for federal office, the broadcaster had to tailor his response to the individual candidate.[97] Across-the-board policies inherently fail to address this standard. Thus the Commission found that NBC's absolute refusal to sell any time was precisely "the type of 'arbitrary blanket ban' that was deemed to be unreasonable in our July 1978 Report and Order."[98] And, it concluded with respect to ABC's and CBS's sales policies:
 
 
 94
 ABC appears to have adopted a blanket policy of refusing to sell time to presidential candidates until January 1980 which, in view of our determination about the state of the campaign is unreasonable.[99]
 
 
 95
 and,
 
 
 96
 We cannot find that these reasons (advanced by CBS) are sufficient to justify a blanket refusal to sell the time; nor can we find that these reasons are sufficient to justify CBS's policy of limiting its sales to candidates to five minute segments.[100]
 
 
 97
 In particular, the across-the-board policies of all three networks failed to address the needs of CMPC as stated by it to wit, for a 30-minute block of time to present a comprehensive statement that would "kick off" the campaign in the thought-to-be crucial days of early December. The FCC did not prejudge that 30 minutes was the only reasonably responsive offer the networks could make. But it was clear 0 minutes, or 5 minutes, would not do especially when those offers were the result of an across-the-board policy. It correctly concluded that, given their proposals, the networks could not have taken the requisite "hard look" at the relevant factors here, especially the first factor, the specific needs of the candidate. Therefore, the Commission correctly concluded that the networks had unreasonably failed to grant access as required by Section 312(a)(7).
 
 D. Conclusion to Section III
 
 98
 In these cases, the Commission's view might be summarized as follows: the interests of broadcasters and candidates must be balanced in determining what constitutes reasonable access; the broadcaster must be responsive to each individual request by a candidate and may not adopt across-the-board policies; the broadcaster must provide a full explanation of the basis of his decision in responding to a request, giving full consideration to all relevant factors; and in the final analysis the Commission's role is to judge the objective reasonableness of the broadcaster's action based on the broadcaster's own explanation of the basis for his decision. In essence, the Commission determines, based upon the record adduced by the broadcaster, whether or not the broadcaster has considered and addressed all non-frivolous matters.
 
 
 99
 Stated as it is summarized in the preceding paragraph, the Commission's position is eminently reasonable. But the actions of the agency in these cases were not flawless. If an agency intends to demand that regulated companies consider and address all relevant factors, it must be clear and consistent in articulating those factors. Here, although the source for each of the standards pressed by the Commission can be seen with hindsight, the agency failed to headline its policy as clearly as it might have.
 
 
 100
 On the other hand, it must be said that during the course of these cases, the FCC gave the networks every opportunity to explain and justify their decisions. The Commission examined the networks' claims with care and deference, and it articulated the reasons and rationale for its actions with clarity. Moreover, the standards employed in the orders under review here represent a very reasonable effort at implementing Section 312(a)(7). The Commission's orders satisfy the requirements for reasoned decision-making set forth by this Circuit in Greater Boston Television Corp. v. FCC.[101]
 
 
 101
 IV. THE CONSTITUTIONALITY OF SECTION 312(A)(7) AS IMPLEMENTED
 
 
 102
 The networks argue that Section 312(a)(7) violates the First Amendment because it impinges upon their editorial discretion, injecting the government into the decisional processes of broadcasting.[102] They cite Miami Herald Publishing Co. v. Tornillo[103] for the proposition that a compulsory access requirement for political candidates would violate the First Amendment if it were applied to the print media. They argue that no decision of the Supreme Court has recognized an affirmative right of access to the broadcast media for any individual or group. The Court, the networks contend, has approved mandatory access schemes only where a broadcaster has triggered rights of reply by a specific programming decision a contingent right of access, so-called.[104] They point to the Court's decisions in CBS v. DNC[105] and FCC v. Midwest Video[106] as indicating the unwillingness of the Supreme Court to authorize any affirmative right of access.
 
 
 103
 The network's reliance on CBS v. DNC and Midwest Video is misplaced. In CBS v. DNC the Court found that nothing in the language of the Communications Act compelled a conclusion different from that reached by the FCC, to wit, that the Commission need not require broadcasters to accept paid political ads. The Court did not address the issue of whether it would be constitutional for the Commission to grant an affirmative right of access in broadcasting even for the general public. It certainly did not reach the constitutionality of the rather limited and qualified rights of access made available to federal candidates only by Section 312(a)(7). In Midwest Video, the Supreme Court's decision turned entirely on statutory, not constitutional, grounds.[107]
 
 
 104
 It is true that the Eighth Circuit's decision in that case[108] did suggest that a general affirmative access requirement would be unconstitutional in cable television. But we are not reviewing an attempt by Congress or the FCC to create a general affirmative right of access either in cable television or on the VHF channels. Rather, we confront a statutory provision creating a limited affirmative right of access in candidates for federal elective office a provision which has been implemented in a concrete way by the FCC. Moreover, cable television is very different from VHF commercial broadcasting of the type involved here. For example, the "scarcity" rationale used to justify FCC regulation in the first place has much less force with regard to cable television than with regard to VHF commercial broadcasting.[109] It is the constitutionality of this statute as implemented which we must consider.
 
 
 105
 The Supreme Court's opinion in CBS v. DNC provides support for the limited affirmative right of access at issue here. In that case, the Court reiterated the teaching of earlier cases that the broadcaster's editorial rights were less important than the rights of viewers and listeners.
 
 
 106
 (W)e have held that "(n)o one has a First Amendment right to a license or to monopolize a radio frequency . . . . Although the broadcaster is not without protection under the First Amendment, "(i)t is the right of the viewers and listeners, not the right of the broadcasters, which is paramount . . . . It is the right of the public to receive suitable access to social, political, esthetic, moral and other ideas and experiences which is crucial here. . . ."[110]
 
 
 107
 It is worth noting that the limited affirmative right of access at issue here is vested in candidates for federal office. The public's right to be informed is nowhere stronger than in the area of elections. And, no speech is more protected than political speech.[111] Furthermore, in television we deal with a medium devoted exclusively to communication and one which, by all accounts is the medium of communication for most of our society. It is difficult to contend that the limited appropriation by government of part of the available spectrum for use in informing the electorate is constitutionally unacceptable.
 
 
 108
 As implemented by the Commission, Section 312(a)(7) provides such a right of affirmative access to a narrowly defined class of citizens. It authorizes access only for political "uses." And, the FCC has developed a procedure which affords leeway to the broadcaster's discretion: (1) the Commission confines its review to a consideration of the reasonableness of the broadcaster's explanation of his basis for refusing requested time, and (2) the reasonableness of the broadcaster's explanation is judged solely by whether he has duly regarded articulated standards.[112] The agency further limits the impact of Section 312(a)(7) on the broadcaster by limiting its applicability to the "political season" as objectively defined by the Commission.[113] This kind of limited allocation of the airwaves does not constitute an unwarranted incursion on editorial rights.
 
 
 109
 It is settled doctrine[114] that the government retains the power to decide how and to whom to allocate the air waves.[115] The right of "use" granted to the candidate under Section 312(a)(7) does not confer on the candidate any right to interfere with what the broadcast journalist says or does on the air. Similarly, the broadcast journalist may not determine what the candidate says or does with the limited amount of air time available to him. Therefore, Section 312(a)(7) represents only a congressional re-allocation of the "use" of portions of the airways from the licensee to the candidate. The broadcaster's exercise of journalistic discretion his right to speak and editorialize is unimpaired.[116]
 
 
 110
 The agency has defined its role and the rights of the candidates in such a way as to minimize the imposition on broadcasters. As implemented, Section 312(a) (7) is a constitutionally acceptable accommodation between, on the one hand, the public's right to be informed about elections and the right of candidates to speak and, on the other hand, the editorial rights of broadcasters.[117]
 
 
 111
 V. THE APPLICATION OF SECTION 312(A)(7) TO THE NETWORKS
 
 
 112
 The networks argue that by its terms Section 312(a)(7) applies only to licensees the Commission may revoke a "station license or construction permit." Thus, they say, the Commission erred in applying the mandate of Section 312(a)(7) to the networks.
 
 
 113
 The Commission construes Section 312(a)(7) as including two severable elements one establishing a reasonable access obligation and the other a specific remedy. It contends that the obligation element is articulated in a way that does not expressly identify the entities subject to the obligation. The obligation is "to allow reasonable access to or to permit purchase of reasonable amounts of time for the use of a broadcasting station. . . ." Given the purpose of the statute, the FCC argues, it is reasonable to read Section 312(a)(7) as imposing an obligation to provide access not just upon individual stations but upon those who, by practice and contractual relationship, control the best practical means of efficiently acquiring national access to wit, the networks.
 
 
 114
 When Congress created an explicit access obligation in Section 312(a) and amended Section 315(a) to reinforce the existence of such an obligation, it did so "to give candidates for public office greater access to the media so that they may better explain their stand on the issues, and thereby more fully and completely inform the voters."[118] Plainly, Congress wanted to enhance the ability of candidates for federal office to communicate with the electorate. At the time, it already was established practice for networks to grant political time to presidential candidates seeking a national audience. Given its objective of explaining candidates' access to the people, Congress could hardly have intended to omit the most important channel of communication available to candidates.[119] The access right accorded to presidential candidates by Section 312(a)(7) would have been robbed of much of its intended significance if the candidate were forced to go from station to station around the country assembling his own network. The time, expense, and coordination difficulties of such an endeavor would deter many candidates, and would be impossible for others.[120]
 
 
 115
 The discussion in Congress surrounding the enactment of Section 312(a)(7) reveals that the legislators voting on the bill used the terms "broadcasting station," "broadcaster," "licensee," and "network" interchangeably.[121] Indeed, when presenting the Conference Report to the Senate, Senator Pastore, the bill's sponsor, referred to networks and individual broadcasters interchangeably.[122] Thus, there is support in the legislative history for the contention that Congress intended Section 312(a)(7) to apply to the networks.
 
 
 116
 Even if Section 312(a)(7) by itself does not afford the Commission power to mandate reasonable network access, such jurisdiction is "reasonably ancillary" to the effective enforcement of the individual licensee's Section 312(a)(7) obligations and, hence, within the Commission's statutory authority.[123] The Communications Act gives broad authority to the Commission to regulate all "interstate and foreign communication by wire or radio,"[124] and defines these communications as
 
 
 117
 the transmission of . . . signals, pictures, and sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission.[125]
 
 
 118
 Other substantive provisions of the Act dictate that the Commission is "to make special regulations applicable to radio stations engaged in chain broadcasting,"[126] to "encourage the larger and more effective use of radio in the public interest,"[127] and to "make such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law, as may be necessary to carry out the provisions of this Act."[128] Moreover, in applying these provisions, the Commission can regulate network practices that do not serve the "public interest, convenience, and necessity."[129]
 
 
 119
 The Supreme Court confirmed the broad and expansive authority of the Commission to regulate broadcasting activities in U. S. v. Southwestern Cable Co.[130] There, the Commission had issued cable system signal carriage rules even though the Communications Act did not expressly authorize regulation of the cable industry. The Court stated:
 
 
 120
 The Commission has reasonably found that the successful performance of (its broad responsibilities for the orderly development of an appropriate system of local television broadcasting) demands prompt and efficacious regulation of community antenna television systems. . . . (W)e may not, "in the absence of compelling evidence that such was Congress' intention . . . prohibit administrative action imperative for the achievement of an agency's ultimate purposes."[131]
 
 
 121
 The Court defined the Commission's authority to regulate as
 
 
 122
 restricted to that reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting.[132]
 
 
 123
 The Commission's action in applying Section 312(a)(7) to the networks is an exercise of its power "reasonably ancillary" to the effective enforcement of the provision.
 
 VI. MOOTNESS
 
 124
 Prior to oral argument, the court asked the parties to submit papers addressing the question of mootness. The court's request was prompted by the fact that CMPC had agreed to accept a 5-minute segment on CBS in December and had contracted to buy a 30-minute segment on ABC in January. The Petitioners, the Respondents, and CMPC as amicus curiae submitted briefs on this question. The parties unanimously contended that the case is not moot. We agree.
 
 
 125
 This case presents a situation where a short-term administrative order is "capable of repetition, yet evading review." Southern Pacific Terminal v. ICC, 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). The Supreme Court has recently articulated two conditions implicit in the Southern Pacific formulation:
 
 
 126
 (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.[133]
 
 
 127
 Here it is clear we have a short-term situation. Moreover, it is certain that the parties will confront each other in this situation again.
 
 
 128
 In the context of elections where fragile rights are at stake, courts must be careful to avoid dismissing litigation as moot.[134] In Flory v. FCC,[135] for example, the Seventh Circuit rejected a contention that an appeal of an FCC decision under Section 315 was mooted by the fact that the election in question had already occurred. Indeed, the Supreme Court has indicated that utilization of the "capable of repetition" exception is especially appropriate where the issue is the interpretation of a statute that impacts upon the electoral process.
 
 
 129
 The "capable of repetition, yet evading review" doctrine, in the context of election cases, is appropriate when there are "as applied" challenges as well as in the more typical case involving only facial attacks (on a statute). The construction of the statute, an understanding of its operation, and possible constitutional limits on its application, will have the effect of simplifying future challenges, thus increasing the likelihood that timely filed cases can be adjudicated before an election is held.[136]
 
 
 130
 That is exactly the case at hand.
 
 VII. CONCLUSION
 
 131
 We hold today that Section 312(a)(7) of the Communications Act does create an affirmative right of access in candidates for federal elective office.
 
 
 132
 We hold that, in implementing this right of access, the FCC has articulated reasonable standards designed to minimize governmental intrusion into broadcasting and to maximize respect for the editorial discretion of broadcasters, while at the same time advancing the important statutory purpose of candidate access. Under these standards, the obligation (or lack thereof) of a network or licensee to provide access to a candidate for federal office is judged in two stages. First, no request for time need be granted prior to the start of the election campaign, a date determined by the Commission with reference to all relevant facts and circumstances. Second, once the campaign has begun, individual requests by candidates must be treated individually by the network or licensee. They may be denied only with advertence to factors enunciated by the Commission, and the reasons for denying the individual request must be articulated. Across the board denials will not be tolerated. The Commission, for its part, will not substitute its judgment for that of the network or licensee in handling individual requests. It will confine itself to the task of ensuring that the broadcaster has considered and addressed all the relevant factors in the individual case and that the offered explanation for the decision is reasonable.
 
 
 133
 We hold that Section 312(a)(7), thus interpreted, is consistent with the requirements of the Constitution.
 
 
 134
 We hold that the FCC is justified in applying Section 312(a)(7) to the networks.
 
 
 135
 And, finally, we hold that in the cases before us the Commission properly found that the networks had failed to fulfill the obligation imposed upon them by Section 312(a)(7).
 
 
 136
 We therefore affirm.
 
 
 137
 So ordered.
 
 TAMM, Circuit Judge, concurring:
 
 138
 When government regulation of our system of freedom of expression[1] calls for a federal agency to decide whether and to what extent the "individual needs" of particular candidates for federal office demand that they be heard on the radio and television airwaves, the danger of nonneutral government decisionmaking raises grave first amendment concerns. Although I join Judge Bazelon's fine opinion for the court, I write separately to discuss the danger that I perceive and to explain my reasons for concurring despite this danger.
 
 
 139
 In Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969), the Supreme Court held that the first amendment does not always prevent the federal government from regulating radio and television broadcasts on the basis of their content. In particular, the Court endorsed the Federal Communications Commission's "fairness doctrine," which imposes a twofold duty on the broadcaster: "The broadcaster must give adequate coverage to public issues, and coverage must be fair in that it accurately reflects the opposing views." Id. at 377, 89 S.Ct. at 1800 (citations omitted). In the form approved by the Supreme Court,[2] the fairness doctrine imposes only a general obligation on broadcast licensees, and broadcasters retain wide flexibility concerning the manner in which they will satisfy this obligation.[3] The Court has stated that the Commission's only responsibility under the doctrine "is to judge whether a licensee's overall performance indicates a sustained good-faith effort to meet the public interest in being fully and fairly informed." Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 127, 93 S.Ct. 2080, 2098, 36 L.Ed.2d 772 (1973).
 
 
 140
 The Court in Red Lion also affirmed the constitutionality of three right-to-reply doctrines. Two of these, the "personal attack" and the "political editorial" rules, are administratively developed offshoots of the general fairness doctrine:
 
 
 141
 When a personal attack has been made on a figure involved in a public issue, . . . the individual attacked himself (must) be offered an opportunity to respond. Likewise, where one candidate is endorsed in a political editorial, the other candidates must themselves be offered reply time to use personally or through a spokesman. These obligations differ from the general fairness requirement that issues be presented, and presented with coverage of competing views, in that the broadcaster does not have the option of presenting the attacked party's side himself or choosing a third party to represent that side. But insofar as there is an obligation of the broadcaster to see that both sides are presented, and insofar as that is an affirmative obligation, the personal attack doctrine and regulations do not differ from the preceding fairness doctrine.
 
 
 142
 395 U.S. at 378, 89 S.Ct. at 1800. The third right-to-reply doctrine, the equal-time rule, is statutory in origin. Section 315 of the Communications Act of 1934, as amended (Act), 47 U.S.C. § 315 (1976), provides: "If any licensee shall permit any person who is a legally qualified candidate for any public office to use a broadcasting station, he shall afford equal opportunities to all other such candidates for that office in the use of such broadcasting station . . . ." Id. § 315(a). See Red Lion Broadcasting Co. v. United States, 395 U.S. at 391, 89 S.Ct. at 1807.[4]
 
 
 143
 Under Red Lion, "the right of the viewers and listeners, not the right of the broadcasters, . . . is paramount," id. at 390, 89 S.Ct. at 1806, particularly when what is at stake is " 'speech concerning public affairs,' " id. (quoting Garrison v. Louisiana, 379 U.S. 64, 74, 85 S.Ct. 209, 215, 13 L.Ed.2d 125 (1964)). See also FCC v. National Citizens Committee for Broadcasting, 436 U.S. 775, 798-800, 98 S.Ct. 2096, 2114, 56 L.Ed.2d 697 (1978). Nonetheless, the first amendment also values broadcaster discretion. As Chief Justice Burger noted in Columbia Broadcasting System, Inc. v. Democratic National Committee, 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1973),
 
 
 144
 (The) role of the Government as an "overseer" and ultimate arbiter and guardian of the public interest and the role of the licensee as a journalistic "free agent" call for a delicate balancing of competing interests. The maintenance of this balance for more than 40 years has called on both the regulators and the licensees to walk a "tightrope" to preserve the First Amendment values written into the Radio Act and its successor, the Communications Act.
 
 
 145
 Id. at 117, 93 S.Ct. at 2094 (opinion of Burger, C. J.). As Judge Bazelon's opinion persuasively demonstrates, the limited access scheme created by section 312(a)(7) of the Act, 47 U.S.C. § 312(a)(7) (1976), as interpreted and applied by the Commission, is consistent with these principles.
 
 
 146
 There is another principle, however, that limits the ability of the government to regulate broadcasting: although the government may play a role in regulating the content of broadcast communications, that role must be carefully neutral as to which speakers or viewpoints are to prevail in the "marketplace of ideas." Thus, while the government may properly take action to encourage a wide-open debate on public issues,[5] see Buckley v. Valeo, 424 U.S. 1, 92-93 & n.127, 96 S.Ct. 612, 669-670 8 n.127, 46 L.Ed.2d 659 (1976), it may not regulate in a manner that advances "one side of an issue rather than the other," A. Meiklejohn, Political Freedom 27 (1960).[6] As Justice Stevens noted in FCC v. Pacifica Foundation, 438 U.S. 726, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978), "it is a central tenet of the First Amendment that the government must remain neutral in the marketplace of ideas." Id. at 745-46, 98 S.Ct. at 3038 (opinion of Stevens, J.). See Columbia Broadcasting System, Inc. v. FCC, 454 F.2d 1018, 1034 (D.C.Cir.1971) (there is a "requirement of governmental neutrality in the area of the First Amendment"). See also Red Lion Broadcasting Co. v. FCC, 395 U.S. at 396, 89 S.Ct. at 1810 (constitutional problems would arise if "the official government view (were to) dominat(e) public broadcasting"); National Broadcasting Co. v. United States, 319 U.S. 190, 226, 63 S.Ct. 997, 1014, 74 L.Ed. 1344 (1943) (constitutional problems would arise if the Federal Communications Commission were authorized "to choose among applicants (for licenses) upon the basis of their political, economic or social views"). Cf. Buckley v. Valeo, 424 U.S. at 48-49, 96 S.Ct. at 649 (government may not "restrict the speech of some elements of our society in order to enhance the relative voice of others").[7] Accordingly, broadcast regulation must be tailored to guard against government action that is nonneutral, i. e., government action that, by purpose or effect, tends to enhance the persuasive appeal of a particular speaker or viewpoint vis-a-vis opposing speakers or viewpoints.[8]
 
 
 147
 The broadcast regulation approved in Red Lion is consonant with this first amendment principle. The basic fairness doctrine protects against government nonneutrality by leaving broad and flexible discretion with the broadcaster; the Commission's circumscribed role in enforcing broadcaster obligations allows little opportunity for nonneutral government decisionmaking. The right-to-reply doctrines also limit the potential for partiality, this time by virtually eliminating the need for discretion on the part of anyone: if the licensee broadcasts a specified type of communication, the applicable right-to-reply obligation arises in a relatively "automatic" fashion.[9] More important, except for the very general[10] and rarely enforced[11] first prong of the basic fairness doctrine, which requires adequate coverage of public issues, all of the regulatory devices approved in Red Lion are designed to ensure that a broadcaster who presents one side of a controversy will balance that coverage with a broadcast of the opposite view. This is the essence of evenhandedness, the antithesis of partiality.
 
 
 148
 Section 312(a)(7), as interpreted and applied by the Commission, presents a different and more suspect form of regulation. It is designed not to achieve a balanced presentation of ideas, but rather to grant air time to particular speakers for initial presentations of their views. The broadcaster obligation it creates, unlike that under the first prong of the fairness doctrine, is specific in nature and, as this case suggests, is likely to be enforced with some vigor.
 
 
 149
 The danger of government nonneutrality under section 312(a)(7) is exacerbated by the Commission's emphasis, in its standards governing the right of access, on the "individual needs" of the candidate. Whether and to what extent a candidate is entitled to broadcast access depends on a weighing of his "individual needs" against the other relevant considerations detailed by the Commission. This evaluation may lead to a determination, for example, that a candidate requesting a half hour for a particular purpose may instead be entitled to only fifteen minutes, see Maj.Op. at 20-21; another candidate, on the other hand, may be found entitled to the full half hour that he seeks.
 
 
 150
 Thus, without regard to any prior broadcast coverage of opposing candidates, an agency of the federal government is authorized to decide, based in significant part on the candidate's "individual needs," whether and to what extent a given political candidate is entitled to be heard on the nation's airwaves. Although the Commission's standards are designed to apply neutrally to all candidates, and call for a rather deferential oversight of broadcaster determinations, there is nonetheless a much greater potential than in Red Lion for government favoritism, perhaps wholly unintentional, of particular speakers and ideas.[12]
 
 
 151
 Moreover, unlike the regulatory approaches upheld in Red Lion, section 312(a) (7) deals solely with candidates for federal political office; in evaluating the danger of government nonneutrality, we cannot ignore the fact that members of the Federal Communications Commission may well have more than a passing interest in the outcome of federal elections, particularly presidential contests.[13] Although the Commission is independent of his direct control, the President of the United States appoints all seven of its members and designates its chairman. See 47 U.S.C. § 154(a) (1976). Commissioners serve seven-year terms, and vacancies occur approximately once a year. Id. § 154(c).[14] To the extent that openings arise, the President may, and typically does, ensure that four of the seven Commissioners are members of his own political party. See id. § 154(b).[15] As the present case suggests, the campaign for the Presidency itself is likely to be the most important occasion for the application of section 312(a)(7). The President and his party obviously have a strong interest in the outcome of a presidential election, particularly if the President himself is a candidate for reelection, and, by the time the campaign begins, the incumbent President will have appointed several (if a first-term President) or perhaps all (if a second-term President) of the sitting Commissioners. Even if a Commissioner makes every effort to remain impeccably neutral, it is nonetheless possible, especially in presidential campaigns, that his partisan and political affiliations might subconsciously influence his decisionmaking.[16]
 
 
 152
 Despite these dangers, however, section 312(a)(7) makes a tremendous positive contribution to the cause of freedom of expression.[17] Candidate access to radio, and especially television, is exceedingly important in a nation that places such extraordinary reliance on these informational media,[18] and we dare not forget that there is also a potential for evil in leaving the question of access in the hands of private broadcasting interests. As the Supreme Court warned in Red Lion, we should guard against
 
 
 153
 station owners and a few networks (having) unfettered power to make time available only to the highest bidders, to communicate only their own views on public issues, people and candidates, and to permit on the air only those with whom they agree( ). There is no sanctuary in the First Amendment for unlimited private censorship operating in a medium not open to all. "Freedom of the press from governmental interference under the First Amendment does not sanction repression of that freedom by private interests." Associated Press v. United States, 326 U.S. 1, 20 (, 65 S.Ct. 1416, 1424, 89 L.Ed. 2013) (1945).
 
 
 154
 395 U.S. at 392, 89 S.Ct. at 1808.[19] By creating a right of access in favor of candidates for this country's highest offices, section 312(a)(7) increases the opportunity for these speakers to reach listeners with the discussion of crucial political issues.
 
 
 155
 The candidate, no less than any other person, has a First Amendment right to engage in the discussion of public issues and vigorously and tirelessly to advocate his own election and the election of other candidates. Indeed, it is of particular importance that candidates have the unfettered opportunity to make their views known so that the electorate may intelligently evaluate the candidates' personal qualities and their positions on vital public issues before choosing among them on election day.
 
 
 156
 Buckley v. Valeo, 424 U.S. 1, 52-53, 96 S.Ct. 612, 651, 46 L.Ed.2d 659 (1976).[20] To give increased play to ideas touching the very essence of our democracy is a goal that surely lies near the heart of the first amendment.
 
 
 157
 Thus, section 312(a)(7), as implemented by the Commission, stands precariously on the first amendment tightrope. It raises the serious danger of nonneutral government action favoring one speaker or viewpoint over another. Yet it also makes a great contribution to the cause of encouraging an "uninhibited, robust, and wide-open"[21] discussion of issues central to our system of government.
 
 
 158
 We could not give effect to the statute's positive contribution to first amendment values in the absence of adequate safeguards for controlling the danger of nonneutrality. In my view, the Commission's standards for implementing section 312(a)(7), as long as they are carefully followed, are sufficient to save the statute from constitutional infirmity. In particular, the Commission is strictly limited to the narrow role of overseeing broadcaster determinations concerning access, determinations that are entitled to great deference before the Commission. Moreover, both at the broadcaster level and before the Commission on review, analysis of the "individual needs" factor must focus solely on the candidate's needs as stated by the candidate and, giving due consideration to the other relevant standards set forth by the Commission, how those needs can be accommodated by the broadcaster. The agency is obliged to affirm any broadcaster decision that is reasonable under the Commission's articulated standards, and it disapproved the network decisions in the present case only because the networks had, in effect, imposed "flat bans" on the sale of the type of time that the Carter-Mondale Committee sought. If the networks had instead given reasonable consideration to the particular request that was made, the Commission would have had no choice but to approve their access decisions.[22]
 
 
 159
 The Commission, through its implementation of section 312(a)(7), has come perilously close to falling into the chasm of impermissible government action. Nonetheless, as long as the agency consistently maintains a very limited "overseer" role consistent with its obligation of careful neutrality, its action does not contravene the Constitution. With this understanding, I concur in the opinion of the court.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. § 293(a)
 
 
 [1]
 47 U.S.C. § 312(a)(7) (1976). Section 312(a)(7) was added to the Communications Act of 1934 as part of the Federal Election Campaign Act of 1971. Title I of that 1971 bill, which contained Section 312(a)(7), was known as the Campaign Communications Reform Act and was the broadcast reform section of the law
 
 
 [2]
 47 U.S.C. § 312(a)(7) (1976). The relevant parts of Section 312 read in full:
 (a) The Commission may revoke any station license or construction permit . . .
 (7) for willful or repeated failure to allow reasonable access to or to permit purchase of reasonable amounts of time for the use of a broadcasting station by a legally qualified candidate for Federal elective office on behalf of his candidacy.
 
 
 [3]
 Carter-Mondale Presidential Committee, Inc., --- FCC2d --- (FCC 79-750, Nov. 21, 1979) (herein Order I), reconsideration denied, --- FCC2d --- (FCC 79-773, Nov. 28, 1979) (herein Order II). Order I is found in the Appendix (App.) at 114; Order II is at 305
 
 
 [4]
 The text of Mr. Rafshoon's letter to the three networks was identical:
 On behalf of the Carter/Mondale Presidential Committee, Inc., I am requesting availabilities for a thirty (30) minute program on ABC between 8:00 p. m. and 10:30 p. m. E.S.T. on December 4, December 5, December 6, or December 7, 1979. This program, to be run in conjunction with an announcement concerning his candidacy by President Carter for the Democratic nomination for President, consists of a documentary outlining the President's record and that of his administration. At the time this program is aired, it may be assumed that President Carter will be a legally qualified candidate under the Communications Act of 1934, as amended, and that the President would appear on the program.
 As you know, the first official contest to select delegates to the Democratic National Convention occurs January 21, 1980, in Iowa, which is 47 days after December 7, 1979, our last requested date for availabilities.
 Unlike all previous Presidential election years, the news media has chosen to focus enormous attention on the Florida Caucus (October 13, 1979) and Convention (November 16-18, 1979) as well as other aspects of the 1980 campaign. As illustration, I have noted that in the six-week period from September 1 through October 9, 1979, ABC devoted 51 minutes, 22 seconds to the 1980 campaign; CBS devoted 51 minutes, 22 seconds to this subject; and NBC devoted 70 minutes. Therefore, our request for the above time seems eminently appropriate in view of the escalating political climate already generated by both print and broadcast media.
 I will expect to hear from one of your sales representatives within the next week regarding a selection of times in order that we may choose a mutually agreeable date.
 App. at 11-12.
 
 
 [5]
 The letter to Mr. Rafshoon from Raymond E. Dillon, Director of Political Sales at CBS, was dated October 17, 1979, and read:
 Dear Mr. Rafshoon:
 This is in response to your request that the CBS Television Network make available for purchase by the Carter/Mondale Presidential Committee, Inc., a half-hour program in prime time to be broadcast between 8:00 and 10:30 PM EST on December 4, 5, 6 or 7, 1979.
 Because of the large number of present potential candidates for the Republican and Democratic presidential nominations, we are at this time unable to accede to your request to purchase a half-hour program. We note that three Democrats and eleven Republicans have already announced, or may reasonably be expected shortly to announce, their presidential candidacies; indeed two candidates for the Republican presidential nomination have already requested to purchase half-hour programs on the CBS Television Network, and their requests have been declined on the same basis as indicated below.
 In light of the above circumstances, were we to provide the half-hour program you seek, accommodating potential requests for equal treatment from other candidates for presidential nomination would involve massive disruptions of the regular entertainment and information schedule of the CBS Television Network. Accordingly, we must respectfully reject your request.
 We are, however, prepared to make one 5-minute segment in prime time and one 5-minute daytime segment available for purchase by your committee. We note that this is the same offer made to the Republican candidates referred to above in response to their requests to purchase half-hour time periods.
 While we are unable to make available time on the dates you have specified, we are able to offer for your purchase a 5-minute period on December 8 between approximately 10:55 and 11:00 PM. We will also provide a specific 5-minute daytime availability for your purchase on request.
 Since it is CBS' policy to sell time only to announced candidates for public office, this offer is, of course, conditional upon President Carter's having announced, or using the time purchased to announce, his presidential candidacy.
 If you are interested in purchasing such a program or programs, please notify us promptly since substantial lead time of approximately four to five weeks is necessary for the editing required to accommodate program segments of this length.
 Very truly yours,
 App. at 19-20.
 
 
 [6]
 The letter to Mr. Rafshoon from Charles C. Allen, Vice President for Sales Administration at ABC, was dated October 23, 1979, and read:
 Dear Mr. Rafshoon:
 This is to confirm my oral response given on October 16th to your letter of October 11, 1979 to Mr. Elton H. Rule, President of American Broadcasting Companies, Inc., requesting air time for the Carter/Mondale Presidential Committee, Inc. on December 4, 5, 6 or 7, 1979.
 As we discussed, the ABC Television Network has not reached a decision as to when it will start selling political time for the 1980 Presidential campaign, and, accordingly, we are not in a position to comply with your request. As I mentioned on the telephone, I believe that later this year a decision will be made to make political time for the Presidential campaign available on ABC-TV early next year.
 It was a pleasure speaking with you last week.
 Sincerely yours,
 App. at 17.
 
 
 [7]
 Letter of Counsel for American Broadcasting, Inc., to the Chief of the Complaints and Compliance Division of the Federal Communications Commission, November 5, 1979. App. at 29
 
 
 [8]
 The letter to Mr. Rafshoon from Joseph J. Iaricci, Vice President for Sales and Administration at NBC, was dated October 23, 1979, and read:
 Dear Mr. Rafshoon:
 This is in response to your letter of October 11, 1979 to Mr. Fred Silverman, on behalf of the Carter/Mondale Presidential Committee, Inc., requesting 30-minute availabilities on NBC between 8:00 and 10:30 PM, EST, on December 4, 5, 6 or 7, 1979.
 We have evaluated your request carefully. Based upon our experience with past campaigns, we believe it is too early in the political season for nationwide broadcast time to be made available for paid political purposes. In addition, we believe that honoring your request at this early stage of the Presidential campaign would require NBC to honor similar requests from a number of other Presidential aspirants. The impact of such an undertaking at this time is, of course, a significant factor in our decision.
 Insofar as the nomination process is now focused on political activities in individual states like Iowa, you may wish to contact stations serving those particular states.
 Please be assured that NBC News will continue to cover important and newsworthy aspects of President Carter's political activities.
 Very truly yours,
 App. at 19.
 
 
 [9]
 Carter-Mondale Presidential Committee, Inc., --- FCC2d --- (FCC 79-750, Nov. 21, 1979). App. at 114
 In dissent, Commissioner Lee argued that the Commission's decision prevented the networks from exercising "their legitimate editorial judgment by rejecting the access request because of its prematurity." App. at 140. He concluded that, therefore, the decision was "a serious abuse of the Commission's discretion." Id. He later stated that he thought the majority's approach created "the appearance of government control over programming." Id. at 338.
 Commissioner Washburn wrote in dissent that the majority opinion would stand for the proposition "that the candidate's own determination of his needs is overriding." App. at 142. The opinion represented "the FCC's interfering with the discretion of the broadcasters and substituting our judgment for theirs." Id. This, he later said, "destroy(ed) the delicate balance between assuring broadcasters' independence of journalistic discretion, affording increased opportunities for political discussion by candidates, and informing the electorate." Id. at 339.
 
 
 [10]
 --- FCC2d at ---; App. at 136
 
 
 [11]
 Carter-Mondale Presidential Committee, Inc., --- FCC2d ---- (FCC 79-773, Nov. 28, 1979). App. at 305
 
 
 [12]
 The National Association of Broadcasters intervened in support of the networks. One amicus brief was submitted by the Carter-Mondale Presidential Committee, Inc. in support of the FCC. Another amicus brief was submitted jointly by the National Citizens Committee for Broadcasting, the National Black Media Coalition, Americans for Democratic Action, the United Food & Commercial Workers International Union, Stewart Rawlings Mott, The Anderson for President Committee, James L. Buckley, the National Education Association, Rep. Albert Gore, Jr., Rep. Bill Frenzel, and Jerome Barron in support of the FCC
 
 
 [13]
 A. Heard, The Costs of Democracy 401-06 (1960)
 
 
 [14]
 Wick, The Federal Election Campaign Act of 1971 and Political Broadcast Reform, 22 De Paul Law Review 582 (1973)
 
 
 [15]
 R. MacNeil, The People Machine 127 (1968)
 
 
 [16]
 Id
 
 
 [17]
 Id. at 127-28
 
 
 [18]
 Wick, The Federal Election Campaign Act of 1971 and Political Broadcast Reform, 22 De Paul Law Review 582 (1973)
 
 
 [19]
 Twentieth Century Fund, Voters' Time, Report of the Twentieth Century Fund Commission on Campaign Costs in the Electronic Era 6 (1969)
 
 
 [20]
 S. Michelson, The Election Mirror 25 (1972)
 
 
 [21]
 Wick, The Federal Election Campaign Act of 1971 and Political Broadcast Reform, 22 De Paul Law Review 583 (1973)
 
 
 [22]
 47 U.S.C. § 312(a)(7) (1976)
 
 
 [23]
 47 U.S.C. § 315(b)(1) (1976)
 
 
 [24]
 47 U.S.C. § 801(1), repealed Pub.L. 93-443, title II, § 205(b), Oct. 15, 1974, 88 Stat. 1278 (1976)
 
 
 [25]
 412 U.S. 94, 113 n.12, 93 S.Ct. 2080, 2092, 36 L.Ed.2d 772 (1972)
 
 
 [26]
 B. Schmidt, Jr., Freedom of the Press v. Public Access 17 (1976)
 
 
 [27]
 47 U.S.C. § 315 (1976)
 
 
 [28]
 47 U.S.C. § 312(a)(7) (1976) (emphasis added)
 
 
 [29]
 Report and Order, Commission Policy in Enforcing Section 312(a)(7), 68 FCC2d 1079 (1978)
 
 
 [30]
 In their briefs and at oral argument, the networks make much of the fact that Section 312(a)(7) was enacted in the context of "a long tradition of not affording rights of access in the first instance to individual speakers." CBS Brief at 20 (emphasis added). This observation underscores the importance of the fact that the language of Section 312(a)(7) focuses on the individual candidate. The plain language of Section 312(a)(7) clearly goes beyond FCC practice under the public interest doctrine
 
 
 [31]
 Nowhere in their briefs do the networks explain why Congress would have referred only to federal candidates if it were intent on codifying Commission practice with regard to all candidates. When asked at oral argument to explain why Congress would have limited Section 312(a)(7) to federal candidates if it were not creating a right of access that went beyond that available under the public interest doctrine, counsel for CBS had no explanation
 
 
 [32]
 S.Rep.No. 96, 92d Cong., 1st Sess. 20 (1971), reprinted in (1972) U.S.Code Cong. & Admin.News, pp. 1773, 1774 (emphasis added). See also S.Rep.No. 229, 92d Cong., 1st Sess. 56 (1971), reprinted in (1972) U.S.Code Cong. & Admin.News, p. 1821; 117 Cong.Rec. 28792 (1971) (statement of Sen. Pastore)
 The report of the Senate Commerce Committee, which provides the most detailed discussion of the 1971 Act, characterizes Section 312(a)(7) as a statutory attempt to "emphasize" the existence of an obligation to make time available to candidates in order to discourage licensees from reducing access in response to restrictions set elsewhere in the 1971 Act on the rates they could charge candidates during preelection periods. S.Rep.No. 96, supra, at 34, reprinted in U.S.Code Cong. & Admin.News at 1781-82. However, it must be said that there is no specific explanation of the statutory language or statement of its intended impact in the Senate report.
 
 
 [33]
 Federal Election Campaign Act: Hearings on S. 1, S. 382, S. 596, Before Subcomm. on Communications of Senate Comm. on Commerce, 92d Cong., 1st Sess. 152 (1971)
 
 
 [34]
 Id. at 348
 
 
 [35]
 H.Conf.Rep.No. 92-752, 92d Cong., 1st Sess. 22 (1971); S.Conf.Rep.No. 92-580, 92d Cong., 1st Sess. 22 (1971)
 
 
 [36]
 Hearings Before the Communications Subcommittee of the Senate Committee on Commerce, 93rd Cong., 1st Sess., ser. 93-4 at 139 (1973)
 
 
 [37]
 Public Notice, Use of Broadcast and Cablecast Facilities by Candidates for Public Office, 34 FCC2d 510, 537-38 (1972) (emphasis supplied)
 
 
 [38]
 Hearings Before the Communications Subcommittee of the Senate Committee on Commerce, 93rd Cong., 1st Sess., ser. 93-4 at 137 (1973)
 
 
 [39]
 Id
 
 
 [40]
 Id. at 190
 
 
 [41]
 Id
 
 
 [42]
 Id
 
 
 [43]
 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1972)
 
 
 [44]
 Id. at 112-13, 93 S.Ct. at 2091
 
 
 [45]
 Id. at 113-14 n.12, 93 S.Ct. at 2091-92
 
 
 [46]
 CBS v. DNC, 412 U.S. at 112-13, 93 S.Ct. at 2091; see also id. at 131, 93 S.Ct. at 2100
 
 
 [47]
 47 U.S.C. § 303(r) (1976)
 
 
 [48]
 In 1978 the Commission issued a Notice of Inquiry which asked, inter alia, whether it should commence rulemaking proceedings in order to clarify licensee obligations under § 312(a)(7). 43 Fed.Reg. 12938 (March 28, 1978). Had it done so, many of the questions raised today may have been resolved. We understand its decision not to do so, however, in light of the strong opposition by petitioners and others to such proceedings. Petitioner CBS, in fact, went so far as to challenge the legality of FCC rulemaking on the grounds that it would "constitute an unwarranted governmental intrusion upon content and scheduling judgments of broadcasters." Report and Order: Commission Policy in Enforcing Section 312(a)(7) of the Communications Act, 68 FCC2d 1079, 1080 (1978). In responding to meritorious Commission initiative by raising such concerns, petitioners have, at the very least, not eased the FCC's burden in interpreting and implementing § 312(a)(7)
 
 
 [49]
 68 FCC2d 1079 (1978)
 
 
 [50]
 Columbia Broadcasting System, Inc. v. FCC, 454 F.2d 1018, 1026 (D.C.Cir.1971)
 
 
 [51]
 Carter-Mondale Presidential Committee, Inc., --- FCC2d ---, --- (FCC # 79-773, November 28, 1979) (Order II). App. at 315
 
 
 [52]
 Id
 
 
 [53]
 --- FCC2d at ---. App. at 314
 
 
 [54]
 Carter-Mondale Presidential Committee, Inc., --- FCC2d ---, --- (FCC # 79-750, November 21, 1979) (Order I). App. at 129-31
 
 
 [55]
 --- FCC2d at ---. App. at 131
 
 
 [56]
 CBS Brief at 29
 
 
 [57]
 Report and Order: Commission Policy on Enforcing Section 312(a)(7), 68 FCC2d 1079, 1091 (1978)
 
 
 [58]
 Id
 
 
 [59]
 Although the networks cite dictum in one decision of the Commission, Anthony R. Martin-Trigona, 66 FCC2d 968, 969 (1977) (holding that Martin-Trigona was not a "legally qualified candidate"), to support their position, they have failed to direct us to a single case where either the Commission or the Broadcast Bureau directly considered the question at hand and decided it in a way which "cannot be reconciled with" the FCC's position in this case. Indeed, in the second Anthony R. Martin-Trigona case, 67 FCC2d 743 (1978), the Commission said that, in addressing this question, "the licensee, and ultimately the Commission must look to the circumstances of each particular case to determine when it is reasonable for a candidate's access to begin. . . ." 67 FCC2d at 746 n.4
 We cannot find that the Commission was "indifferent to the rule of law" and its past precedents in deciding independently to determine the date upon which access rights accrue to federal candidates. Columbia Broadcasting System, Inc. v. FCC, 454 F.2d 1018, 1026 (D.C.Cir.1971).
 
 
 [60]
 As Commissioner Brown noted in his separate statement on reconsideration: "The Commission did not create this factual situation, but neither we nor the networks can ignore it." Order II, --- FCC2d ---, --- (1979). App. at 330
 
 
 [61]
 ABC insists that a result of the Commission's ruling is that the candidate's needs or desires will govern when the broadcaster must begin selling time in a campaign. See, e. g., ABC Brief at 18, 26, 30, 36, 43-46, 50. But the Commission held that the "candidates needs" is one of the considerations to be weighed by the broadcaster after a threshold determination has been made that the campaign is under way and the obligations imposed by Section 312(a)(7) have attached. See Order II, --- FCC2d ---, --- (1979). App. at 321-24. The "candidate's needs" play no role in determining whether Section 312(a)(7) obligations have attached
 
 
 [62]
 See Section IV infra
 
 
 [63]
 The business and commercial aspects of journalism, for example, are not immunized from regulation by first amendment considerations. See, Citizen Publishing Co. v. U. S., 394 U.S. 131, 139-140, 89 S.Ct. 927, 931-932, 22 L.Ed.2d 148 (1951) (no immunity from antitrust laws); Associated Press v. NLRB, 301 U.S. 103, 132-33, 57 S.Ct. 650, 655-56, 81 L.Ed. 953 (1937) (National Labor Relations Act held applicable to news-gathering organization). Nor may a news reporter refuse to testify before a grand jury, even as to information acquired through reporting activities. Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (1972)
 
 
 [64]
 CBS v. DNC, 412 U.S. 94, 124, 93 S.Ct. 2080, 2097, 36 L.Ed.2d 772 (1973)
 
 
 [65]
 National Broadcasting Co. v. FCC, D.C.Cir., 516 F.2d 1101, 1173 (Bazelon, C. J., dissenting from the order vacating the previous order granting rehearing en banc )
 
 
 [66]
 Cf. American Security Council Education Foundation v. FCC, 607 F.2d 438 (D.C.Cir.1979), cert. denied 444 U.S. 1013, 100 S.Ct. 662, 62 L.Ed.2d 642
 
 
 [67]
 Order II, --- FCC2d ---, --- (1979). App. at 321
 
 
 [68]
 CMPC Brief at 32-34
 
 
 [69]
 Order I, --- FCC2d ---, --- and n.16 (1979). App. at 126-27
 
 
 [70]
 Report and Order, Commission Policy on Enforcing Section 312(a)(7), 68 FCC2d 1079 (1978)
 
 
 [71]
 Order I, --- FCC2d ---, --- (1979). App. at 126
 
 
 [72]
 444 F.2d 841, 851 (D.C.Cir.1971), cert. denied, 406 U.S. 950, 92 S.Ct. 2042, 32 L.Ed.2d 338 (1972)
 
 
 [73]
 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971)
 
 
 [74]
 Permian Basin Area Rate Cases, 390 U.S. 747, 792, 88 S.Ct. 1344, 1373, 20 L.Ed.2d 312 (1968). See also Burlington Truck Lines v. United States, 371 U.S. 156, 167-68, 83 S.Ct. 239, 245, 9 L.Ed.2d 207 (1962); WAIT Radio v. FCC, 418 F.2d 1153, 1156 (D.C.Cir.1969)
 
 
 [75]
 Straus Communications, Inc. v. FCC, 530 F.2d 1001, 1011 (D.C.Cir.1976)
 
 
 [76]
 Report and Order: Commission Policy in Enforcing Section 312(a)(7) of the Communications Act, 68 FCC2d 1079 (1978)
 
 
 [77]
 Id. at 1089
 
 
 [78]
 Id
 
 
 [79]
 Id. at 1089 n.14 (1978)
 
 
 [80]
 Id. at 1090
 
 
 [81]
 Id
 
 
 [82]
 Id. at 1094
 
 
 [83]
 Order I, --- FCC2d ---, --- (1979). App. at 126
 
 
 [84]
 Order II, --- FCC2d ---, --- (1979)
 
 
 [85]
 Id. at ---. App. at 315-21
 
 
 [86]
 Id. at ---. App. at 317
 
 
 [87]
 Id. at ---. App. at 322
 
 
 [88]
 Id. at ---. App. at 316. See also Separate Statement of Commissioner Brown, --- FCC2d at ---. App. at 332
 
 
 [89]
 Id. at ---. App. at 317
 
 
 [90]
 Order I, --- FCC2d ---, --- (1979). App. at 133
 
 
 [91]
 47 U.S.C. § 315 (1976)
 
 
 [92]
 Commission Policy in Enforcing Section 312(a)(7) of the Communications Act, 68 FCC2d 1079, 1090 (1978)
 
 
 [93]
 See Section IIIB(1) supra
 
 
 [94]
 See Section IIIA supra
 
 
 [95]
 See Order I, --- FCC2d ---, --- (1979). App. at 134
 
 
 [96]
 Id. at ---. App. at 135
 
 
 [97]
 See Section IV B(2) supra
 
 
 [98]
 CBS states that "if the circumstances of the individual candidate were required to be considered . . . it would have been reasonable for CBS to make a limited offer of program time at this point, in light of the fact that President Carter enjoys unparalleled access to the media." CBS Brief at 38. ABC makes a similar argument, ABC Brief at 55, and NBC refers to the argument in a footnote, NBC Brief at 43. These arguments ignore the plain meaning of the statute and the Commission's interpretation of that language as articulated in Penny Manes, 42 FCC2d 878 (1973). The statute makes clear that the obligation to afford "reasonable access" can be satisfied only through the sale or gift of "use(s)" of the station and that coverage of the candidate in news programming is not sufficient. Moreover, as early as 1973, the Commission stated that "Section 312(a)(7) relates to 'use' of a licensee's facilities by the candidate, not to a licensee's coverage of a candidate's campaign in news or public affairs programming." Penny Manes, 42 FCC2d 878 at 882-83
 
 
 [99]
 Order II, --- FCC2d ---, --- (1979). App. at 323 (emphasis supplied)
 
 
 [100]
 Order I, --- FCC2d ---, --- (1979). App. at 134-35 (emphasis supplied)
 
 
 [101]
 444 F.2d 841 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971)
 
 
 [102]
 At the outset, a tension in the overall argument of the networks is worth noting. On the one hand, they concede that the Congress and the FCC can require, and have required, broadcasters to grant access to political candidates as a group under the rubric of the public interest doctrine. Indeed, they cite the dictum in CBS v. DNC, 412 U.S. at 113-14 n.12, 93 S.Ct. at 2091-92 (1972), to show that the language of Section 312(a)(7) is nothing more than a codification of the public interest rule. On the other hand, they argue that the imposition of a burden of granting access to individual candidates for federal office is an impermissible interference with their editorial privileges. This seems disingenuous. The interference with editorial discretion seems no more or less under either approach
 
 
 [103]
 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974)
 
 
 [104]
 See, e. g., Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 89 S.Ct. 1794, 23 L.Ed.2d 731 (1969)
 
 
 [105]
 412 U.S. 94, 93 S.Ct. 2080, 36 L.Ed.2d 772 (1972)
 
 
 [106]
 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979)
 
 
 [107]
 The Supreme Court reserved consideration of the constitutionality of a generally available affirmative right of access to cable television. 99 S.Ct. at 1446 n.19
 The heavy reliance of the networks on the dictum in CBS v. DNC regarding Section 312(a)(7) is plainly inconsistent with their arguments regarding the constitutionality of the FCC's attempt to impose a generally available affirmative right of access to cable television. It may be that the FCC's effort in that regard was unconstitutional we do not as yet have a Supreme Court pronouncement on it. But the FCC's regulations for cable television were cited approvingly in dictum appearing as text (as opposed to dictum in a footnote) in CBS v. DNC, 412 U.S. 94, 113-32, 93 S.Ct. 2080, 2091-2101, 36 L.Ed.2d 772 (1972).
 
 
 [108]
 571 F.2d 1025, 1053-57 (8th Cir. 1978), aff'd, 440 U.S. 689, 99 S.Ct. 1435, 59 L.Ed.2d 692 (1979)
 
 
 [109]
 See Brandywine-Main Line Radio, Inc. v. Federal Communications Commission, 473 F.2d 16, 75-76 (D.C.Cir.1972) (Bazelon, Chief Judge, dissenting)
 
 
 [110]
 412 U.S. at 102, 93 S.Ct. at 2086 (1972) (citations omitted)
 
 
 [111]
 See Wellington, On Freedom of Expression, 88 Yale L.J. 1105 (1979)
 
 
 [112]
 See Section IIIB supra
 
 
 [113]
 See Section IIIA supra
 
 
 [114]
 Elsewhere this writer has questioned the validity of the "scarcity" rationale as a justification for regulation of the broadcast media. See, e. g., Bazelon, FCC Regulation of the Telecommunications Press, 1975 Duke Law Journal 213, 223 (1975). It must be said, however, that the "scarcity" rationale is most valid when applied to VHF television. Id. And, these comments notwithstanding, it cannot be doubted that the power of the government to allocate radio and television frequencies has been upheld. See, e. g., National Broadcasting Co. v. United States, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344 (1943)
 
 
 [115]
 See Red Lion Broadcasting v. FCC, 395 U.S. 367, 390-91, 89 S.Ct. 1794, 1806-07, 23 L.Ed.2d 371 (1969) (the First Amendment confers no right on licensees to prevent others from broadcasting on "their" frequencies and no right to an unconditional monopoly of a scarce resource which the Government has denied others the right to use)
 
 
 [116]
 The government practice involved here is analogous to reasonable time, place, and manner restrictions. Such restrictions have long been recognized as constitutionally acceptable. See, e. g., Police Dept. of Chicago v. Mosley, 408 U.S. 92, 98, 92 S.Ct. 2286, 2291, 33 L.Ed.2d 212 (1972); cf. Cox v. Louisiana, 379 U.S. 536, 554, 85 S.Ct. 453, 464, 13 L.Ed.2d 471 (1965); Cox v. New Hampshire, 312 U.S. 569, 574, 61 S.Ct. 762, 763, 85 L.Ed. 1049 (1941); Schneider v. State, 308 U.S. 147, 160, 60 S.Ct. 146, 150, 84 L.Ed. 155 (1939)
 
 
 [117]
 The majority shares the first amendment concerns expressed by Judge Tamm, and welcomes the admonition regarding agency conduct that is embodied in his concurring opinion
 
 
 [118]
 See note 32 supra
 
 
 [119]
 One aspect of the Commission's interpretation of networks-licensee obligations is worth noting here. Affiliates are likely to receive access demands in addition to those resulting from network offers of political programming. For example, presidential candidates seeking time on individual stations during local primaries, congressional candidates, and candidates for state and local offices may make requests to affiliates. The Commission recognized that "some individual affiliates might reasonably decline" to carry a political broadcast supplied by the network because of such special factors. App. at 314. Such flexibility is both necessary and laudable
 
 
 [120]
 The practical consequence of network immunity from Section 312(a)(7) would be most extreme in the final days of a general presidential election. Candidates would be forced to canvas the country for stations willing to broadcast last minute appeals to the voters. Congress could not have intended such a practical bar to televised communications between presidential candidates and the national electorate on the eve of an election
 
 
 [121]
 See, e. g., 116 Cong.Rec.R. 5717, 5719 (1970) (remarks of Sen. Pastore), 5724 (remarks of Sen. Baker), 5732 (remarks of Sen. Yarborough), 5637 (remarks of Sen. Cotton), 8056 (remarks of Rep. Martin), 8057 (remarks of Rep. MacDonald), 8069 (remarks of Rep. Springer), 8071-72 (remarks of Rep. Broyhill), 8074 (remarks of Rep. Tiernan), 8075 (remarks of Rep. Vanik), 8078 (remarks of Rep. Murphy), 8082 (remarks of Rep. Springer), and 8083 (remarks of Rep. Eckhardt)
 
 
 [122]
 117 Cong.Rec.S. 21638 (daily ed., 92d Cong., 1st Sess., Dec. 14, 1971)
 
 
 [123]
 United States v. Southwestern Cable Co., 392 U.S. 157, 178, 88 S.Ct. 1994, 2005, 20 L.Ed.2d 1001 (1968)
 
 
 [124]
 47 U.S.C. 152(a) (1976). See also National Broadcasting Company, Inc. v. United States, 319 U.S. 190, 219, 63 S.Ct. 997, 1010, 87 L.Ed. 1344 (1943)
 
 
 [125]
 47 U.S.C. 153(a)-(b) (1976)
 
 
 [126]
 47 U.S.C. 303(i) (1976)
 
 
 [127]
 47 U.S.C. 303(g) (1976)
 
 
 [128]
 47 U.S.C. 303(r) (1976)
 
 
 [129]
 47 U.S.C. 302a (1976)
 
 
 [130]
 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968)
 
 
 [131]
 Id. at 177, 88 S.Ct. at 2005, quoting Permian Basin Area Rate Cases, 390 U.S. 747, 780, 88 S.Ct. 1344, 1366, 20 L.Ed.2d 312 (1968)
 
 
 [132]
 Id. See also Mt. Mansfield TV, Inc. v. FCC, 442 F.2d 470, 480 (D.C.Cir.1971). General Telephone Co. of Calif. v. FCC, 413 F.2d 390, 403 (D.C.Cir.1969). In contrast to FCC v. Midwest Video Corp. (Midwest II), which is cited by the networks, the Commission here imposed on the targets of its ancillary jurisdiction (the networks) an obligation of a character which could be imposed on individual television licensees. Congress itself has identified reasonable access to broadcast facilities as a statutory goal. Clearly, the Commission has authority to regulate the networks "with a purpose affirmatively to promote (a) goal pursued in the regulation of television broadcasting."
 
 
 [133]
 Gannett Co. v. DePasquale, 443 U.S. 368, 99 S.Ct. 2898, 2904, 61 L.Ed.2d 608 (1979), quoting Weinstein v. Bradford, 423 U.S. 147, 149, 96 S.Ct. 347, 348, 46 L.Ed.2d 350 (1975)
 
 
 [134]
 See, e. g., Moore v. Ogilvie, 394 U.S. 814, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1968)
 
 
 [135]
 528 F.2d 124 (7th Cir. 1975)
 
 
 [136]
 Storer v. Brown, 415 U.S. 724, 737 n.8, 94 S.Ct. 1274, 1282, 39 L.Ed.2d 714 (1974)
 
 
 [1]
 See generally T. Emerson, The System of Freedom of Expression (1970)
 
 
 [2]
 The Court's decision in Red Lion did not require "approv(al) of every aspect of the fairness doctrine." 395 U.S. at 396, 89 S.Ct. at 1809
 
 
 [3]
 "At center stage of the Commission's regulatory scheme is its determination that broadcasters should have maximum editorial discretion in deciding how to fulfill fairness doctrine obligations." American Security Council Educ. Foundation v. FCC, 607 F.2d 438, 445 (D.C.Cir.1979) (en banc), cert. denied, 444 U.S. 1013, 100 S.Ct. 662, 62 L.Ed.2d 642 (1980)
 
 
 [4]
 These right-to-reply doctrines would be intolerable if applied to the print media. See Miami Herald Publishing Co. v. Tornillo, 418 U.S. 241, 94 S.Ct. 2831, 41 L.Ed.2d 730 (1974). A different rule applies to broadcasters on the theory that it is legitimate for the government to allocate the use of a finite number of broadcast frequencies, and it is therefore legitimate for the government to reallocate part of the use of a frequency previously granted to a particular licensee. See Red Lion Broadcasting Co. v. FCC, 395 U.S. at 388-92, 89 S.Ct. at 1805-07. See also National Broadcasting Co. v. United States, 319 U.S. 190, 226, 63 S.Ct. 997, 1014, 87 L.Ed. 1344 (1943); Federal Radio Comm'n v. Nelson Bros. Bond & Mortgage Co., 289 U.S. 266, 282, 53 S.Ct. 627, 635, 77 L.Ed. 1166 (1933)
 
 
 [5]
 This country has "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 721, 11 L.Ed.2d 686 (1964)
 
 
 [6]
 There is a similar requirement of neutrality under the establishment-of-religion clause of the first amendment, in that government may not "prefer one religion over another." Everson v. Board of Educ., 330 U.S. 1, 15, 67 S.Ct. 504, 511, 91 L.Ed. 711 (1947). The requirement of religious neutrality goes further, however, by precluding the government from aiding the cause of religion generally, even if it could do so without favoring any particular religion. See id. The government is, on the other hand, permitted to further the general cause of freedom of expression. See Buckley v. Valeo, 424 U.S. 1, 92-93 & n.127, 96 S.Ct. 612, 669-670 8 n.127, 46 L.Ed.2d 659 (1976)
 
 
 [7]
 Judge Bazelon analogizes the government action here under review to a "time, place, and manner" restriction. Maj. Op. at 25 n.116. Significantly, however, such restrictions may not " 'slip from the neutrality of time, place, and circumstance into a concern about content.' " Police Dep't v. Mosley, 408 U.S. 92, 99, 92 S.Ct. 2286, 2292, 33 L.Ed.2d 212 (1972) (quoting Kalven, The Concept of the Public Forum: Cox v. Louisiana, 1965 Sup.Ct.Rev. 1, 29). Although broadcast regulation may to some extent "slip into a concern about content," it may not lose sight of the fundamental requirement of neutrality as between particular speakers or viewpoints
 
 
 [8]
 The requirement of neutrality here, as in other contexts, may be "notoriously difficult" to define. See King's Garden, Inc. v. FCC, 498 F.2d 51, 56 (D.C.Cir.), cert. denied, 419 U.S. 996, 95 S.Ct. 309, 42 L.Ed.2d 269 (1974). At least as to its "effect" component, for example, the requirement cannot be absolute; it would be impracticable to demand that content-based regulation never operate to favor, even in the slightest degree, one viewpoint over another. See also note 9 infra. One thing is clear, however: whatever its application in other contexts, the principle of neutrality is at its zenith in the context of political speech. Difficulty of definition, of course, does not negate the importance of the basic constitutional requirement, nor does it excuse the judiciary from the task of formulating and applying fundamental principles of constitutional law
 
 
 [9]
 To be sure, even in deciding whether a fairness or a right-to-reply obligation has attached and, if so, whether it has been satisfied, the Commission might take action that improperly favors a particular speaker or viewpoint. This limited danger, however, is one that we tolerate because of the countervailing first amendment benefits that these doctrines generally produce by encouraging a balanced coverage of issues of public importance. See also note 8 supra
 
 
 [10]
 See American Security Council Educ. Foundation v. FCC, 607 F.2d 438, 444 n.16 (D.C.Cir.1979) (en banc), cert. denied, 444 U.S. 1013, 100 S.Ct. 662, 62 L.Ed.2d 642 (1980); Simmons, The Problem of "Issue" in the Administration of the Fairness Doctrine, 65 Cal.L.Rev. 546, 578-86 (1977)
 
 
 [11]
 The first prong of the fairness doctrine, the obligation to devote adequate broadcast time to the coverage of public issues, has been only minimally enforced by the Commission. See Comment, Enforcing the Obligation to Present Controversial Issues: The Forgotten Half of the Fairness Doctrine, 10 Harv.C.R.-C.L.L.Rev. 137 (1975). "(T)he obligation to present controversial issues has been essentially unenforced. The Commission has consistently sought to avoid even the appearance of regulating the content of programming and thus has continually left to the licensee's discretion the determination of which issues are sufficiently important and controversial to warrant coverage." Id. at 153. Indeed, at least in the view of two commentators, the obligation had never been enforced prior to the Commission's 1976 decision in Representative Patsy Mink, 59 F.C.C.2d 987 (1976). See Simmons, supra note 10, at 578-82; Comment, Power in the Marketplace of Ideas: The Fairness Doctrine and the First Amendment, 52 Tex.L.Rev. 727, 739 (1974)
 
 
 [12]
 As CBS correctly observes, there is an "inherent danger in having a federal agency make determinations as to how much access and what kinds of access particular candidates should have, a danger which exists because of the risk that the agency under such circumstances could favor one candidate over another." Reply Brief of Petitioner CBS Inc. at 14
 
 
 [13]
 CBS contends that "(t)he inherently political nature of the questions to be considered will draw the Commission into situations where its impartiality will be subject to obvious question. The danger that standards will not be applied neutrally necessarily suggests the unconstitutionality of the system of government regulation." Brief for Petitioner CBS Inc. at 44 (citation omitted)
 
 
 [14]
 In fact, due to deaths and resignations, many recent Presidents have been able to make more than one appointment per year. See Robinson, The Federal Communications Commission: An Essay on Regulatory Watchdogs, 64 Va.L.Rev. 169, 184 (1978)
 
 
 [15]
 Even the limitation that no more than four Commissioners may be members of the same political party "is evaded easily if an appointee is willing to be labeled an 'independent.' " Id. at 184 n.36
 
 
 [16]
 Regrettably, there is some evidence that the Commission has, on occasion, been subjected to direct political pressure. In a 1970 memorandum describing administration efforts to achieve more favorable press coverage by the three major television networks, Charles Colson, Special Counsel to then President Richard M. Nixon, indicated that, "as soon as we have a majority," he would pursue with Dean Burch, the newly-appointed Commission Chairman, a Commission ruling that would have "an inhibiting impact on the networks." Memorandum from Charles W. Colson to H. R. Haldeman, Sept. 25, 1970, reprinted in Bazelon, FCC Regulation of the Telecommunications Press, 1975 Duke L.J. 213, 247. In a taped conversation in 1972, President Nixon himself threatened to use the Commission to retaliate against The Washington Post for unfavorable coverage: "The main, main thing is the Post is going to have damnable, damnable problems out of this one. They have a television station . . . and they're going to have to get it renewed." Statement of Richard M. Nixon to H. R. Haldeman and John Dean, Sept. 15, 1972, quoted in S.Rep.No. 981, 93rd Cong., 2d Sess. 149 (1974) (final report of Senate Watergate committee). For a further discussion of the potential for political use of the Commission, see Comment, Enforcing the Obligation to Present Controversial Issues: The Forgotten Half of the Fairness Doctrine, 10 Harv.C.R.-C.L.L.Rev. 137, 157-58 (1975). Cf. Columbia Broadcasting Sys., Inc. v. FCC, 454 F.2d 1018, 1036 (D.C.Cir.1971) (Tamm, J., concurring) (concluding, "although hesitantly, (that in the case then under review) the Commission ha(d) taken a political role of interference contrary to all of the teachings of administrative decision-making")
 
 
 [17]
 See also Buckley v. Valeo, 424 U.S. 1, 92-93 & n.127, 96 S.Ct. 612, 669-670 8 n.127, 46 L.Ed.2d 659 (1976); note 6 supra
 
 
 [18]
 In a 1974 survey of prominent educators, businessmen, labor leaders, and government officials, television was rated the most powerful institution in the United States. The White House ranked second, the Supreme Court third. Who Runs America ? A National Survey, U.S. News & World Rep., Apr. 22, 1974, at 30. See also S. Simmons, The Fairness Doctrine and the Media 1-2 (1978)
 
 
 [19]
 Cf. Brandywine-Main Line Radio, Inc. v. FCC, 473 F.2d 16, 62 (D.C.Cir.1972) ("The first amendment was never intended to protect the few while providing them with a sacrosanct sword and shield with which they could injure the many."), cert. denied, 412 U.S. 922, 93 S.Ct. 2731, 37 L.Ed.2d 149 (1973)
 
 
 [20]
 See also Monitor Patriot Co. v. Roy, 401 U.S. 265, 272, 91 S.Ct. 621, 625, 28 L.Ed.2d 35 (1971) ("it can hardly be doubted that the (first amendment) has its fullest and most urgent application precisely to the conduct of campaigns for political office")
 
 
 [21]
 New York Times Co. v. Sullivan, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964). See note 5 supra
 
 
 [22]
 Another significant factor in deciding the constitutionality of § 312(a) (7), as implemented, is the presence of the equal-time provision in § 315 of the Act, 47 U.S.C. § 315 (1976). Section 315 generally will create a right to reply in favor of the opponents of any candidate granted access under § 312(a) (7), thus serving as an important safety net by mitigating the effect of any nonneutrality that might creep into the § 312(a)(7) decisionmaking process. If this were not the case, § 312(a)(7), as implemented, would raise a different and more troublesome constitutional question. That question, of course, is one for another day